**GLOBAL CROSSING TELECOMMUNICATIONS, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**Bell Atlantic–Delaware, Inc., et al., Intervenors.**

**No. 00–1204.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 2001.

Decided Aug. 21, 2001.

Michael J. Shortley, III argued the cause for petitioner. With him on the briefs were Danny E. Adams and Steven A. Augustino.

Rodger D. Citron, Counsel, Federal Communications Commission, argued the cause for respondent. On the brief were Christopher J. Wright, General Counsel, John E. Ingle, Deputy Associate General Counsel, Laurel R. Bergold, Counsel, A. Douglas Melamed, Acting Assistant Attorney General, U.S. Department of Justice, and Catherine G. O'Sullivan and Andrea Limmer, Attorneys.

Michael E. Glover, Edward Shakin, Gilbert E. Geldon and John M. Goodman were on the brief for intervenors Verizon Telephone Companies.

Before: SENTELLE, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Global Crossing Telecommunications, Inc. petitions for review of an order of the Federal Communications Commission (FCC), requiring Global Crossing to pay Verizon Telephone Companies compensation for payphone calls originating from Verizon payphones and routed over Global Crossing's network.[1] Finding the FCC's decision consistent with the statutory scheme and neither arbitrary nor capricious, we deny the petition for review.

I

In § 276 of the Telecommunications Act of 1996,[2] Congress directed the FCC to:

---

1. At the time of the proceedings below, Global Crossing was known as Frontier Communications Services, Inc., and Verizon was known as Bell Atlantic.

2. Pub.L. No. 104–104, 110 Stat. 56 (1996) (codified in scattered sections of 47 U.S.C.).

prescribe regulations that—

    (A) establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone ...; [and]

    (B) discontinue ... all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A).

47 U.S.C. § 276(b)(1)(A), (B).[3] Pursuant to Congress' direction, the FCC issued orders in 1996 that implemented the provisions of § 276, including paragraphs (A) and (B). *See* Report and Order, *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 11 FCC Rcd 20,541, 1996 WL 547458 (1996); *Order on Reconsideration*, 11 FCC Rcd 21,233, 1996 WL 658824 (1996), *aff'd in part and remanded in part sub nom. Illinois Pub. Telecomm. Ass'n v. F.C.C.*, 117 F.3d 555 (D.C.Cir.1997) (collectively, *Payphone Orders*).

With respect to paragraph (A), the FCC required interexchange carriers (IXCs) that carry calls originating from payphones to compensate the payphone service provider (PSP).[4] *See* 47 C.F.R. § 64.1300(a) ("[E]very carrier to whom a completed call from a payphone is routed shall compensate the payphone service provider for the call at a rate agreed upon by the parties by contract."); Report and Order, *Payphone Orders*, 11 FCC Rcd at 20,566, ¶ 48; *id.* at 20,584, ¶ 83. Previously, PSPs had received no revenue for origi-

nating certain calls (such as subscriber 800 and other toll-free number calls) and were prohibited from blocking callers from making some of those calls (such as access code calls). *See Bell Atlantic–Delaware v. Frontier Communications Servs. Inc.*, 14 FCC Rcd 16,050, 16,053–54, ¶ 5 (Com. Car. Bur.1999) (hereinafter "Bureau Order"). The Commission concluded that PSPs must be compensated for all such calls, and determined that IXCs, as the primary beneficiaries of those calls, should be responsible for providing that compensation. *See id.* at 16,054, ¶ 5; Report and Order, *Payphone Orders*, 11 FCC Rcd at 20,584, ¶ 83.

To implement paragraph (B), the FCC ruled that in order to receive compensation for completed calls originating from its payphones, a PSP that is also a local exchange carrier (LEC PSP), *see supra* note 4, "must be able to certify" that it has complied with several requirements, including the institution of "effective intrastate tariffs reflecting the removal of charges that recover the costs of payphones and any intrastate [payphone] subsidies." Order on Reconsideration, *Payphone Orders*, 11 FCC Rcd at 21,293, ¶ 131. The FCC delegated to its Common Carrier Bureau the authority to make "any necessary determination as to whether a LEC has complied with all requirements" for compensation. *Id.* at 21,294, ¶ 132.

Verizon is a LEC PSP that offers local exchange and payphone services in the northeast and mid-Atlantic states. Global Crossing is an IXC that provides both interstate and intrastate telephone toll ser-

---

**3.** For background regarding § 276, see *American Pub. Communications Council v. FCC*, 215 F.3d 51, 53 (D.C.Cir.2000); *Illinois Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555, 558–61 (D.C.Cir.1997).

**4.** "Long-distance telephone traffic is ordinarily transmitted by a local exchange carrier

('LEC') from its origin to a long-distance carrier (or interexchange carrier or 'IXC'). The IXC carries the traffic to its region of destination and hands it off to the LEC there." *U.S. Tel. Ass'n v. FCC*, 188 F.3d 521, 523–24 (D.C.Cir.1999).

vice. Since October 1997, when the per call compensation requirement became effective, Verizon has delivered calls from its payphones to Global Crossing.

In June 1997, in order to obtain compensation for calls originating from Verizon's payphones and carried by Global Crossing, Verizon presented Global Crossing with signed letters attesting that it had complied with all of the conditions for receiving compensation, including the elimination of intrastate subsidies. Global Crossing replied that it would not pay compensation until Verizon provided additional information, specified by Global Crossing, establishing that Verizon had in fact satisfied the compensation eligibility prerequisites—particularly the removal of those subsidies. In June 1998, representatives of Verizon and Global Crossing met with staff of the Common Carrier Bureau, who advised that under the FCC's rules and orders, "IXCs must compensate a LEC payphone service provider upon receipt of the LEC's certification of eligibility without further inquiry or requirements." Bureau Order, 14 FCC Rcd at 16,058, ¶ 10. Nonetheless, Global Crossing continued to refuse to pay, and, on July 15, 1998, Verizon filed a formal complaint with the FCC pursuant to 47 U.S.C. § 208.[5] The complaint alleged that Global Crossing had violated 47 U.S.C. § 276, as well as 47 C.F.R. § 64.1300, by failing to compensate Verizon for more than 11,200,000 calls. Complaint ¶¶ 33–35.

In September 1999, the Common Carrier Bureau held that Verizon had adequately certified its compliance with the prerequisites for receiving compensation and ordered Global Crossing to pay Verizon for applicable past and future calls. Bureau Order, 14 FCC Rcd at 16,052, ¶ 3. The Bureau determined that "[t]he term 'certification' ... does not mandate that a LEC payphone service provider *prove* to the IXC payor that it has satisfied each compensation eligibility prerequisite," but rather requires that a LEC "*attest*[ ] *authoritatively* to an IXC payor that such LEC payphone service provider has satisfied each prerequisite." *Id.* (emphasis added). The Bureau found that interpretation to be consistent with prior Commission orders, and permissible under the language of § 276. *Id.* at 16,063–65, ¶¶ 18–19, 22. And it held that if Global Crossing (or any other IXC) wished to question "the veracity of a LEC's certification," it was obliged to do so by filing its own complaint with the Commission, rather than by simply refusing to make payment. *Id.* at 16,068, ¶ 27.

The FCC affirmed the Bureau's decision in all respects. Order on Review, *Bell Atlantic–Delaware v. Frontier Communications Servs., Inc.*, 15 FCC Rcd 7475, 7480, ¶ 11, 2000 WL 423068 (2000) (hereinafter "FCC Order"). The Commission also refused to consider Global Crossing's "affirmative defense" that Verizon "in fact, had not qualified for payphone compensation." *Id.* at 7479, ¶ 9. The Commission held that this "so-called 'affirmative defense'" was "irrelevant to evaluating [Global Crossing's] obligation to pay upon receiving certification," and "was not properly before the Bureau in the context of" a complaint filed by a LEC PSP. *Id.*

---

**5.** Section 208, entitled "Complaints to Commission," states:

a) Any person ... complaining of anything done or omitted to be done by any common carrier subject to this chapter, in contravention of the provisions thereof, may apply to said Commission by petition.... If such carrier ... shall not satisfy the complaint within the time specified or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper.

47 U.S.C. § 208.

"[T]he proper way for an IXC to challenge a LEC's failure to remove unlawful subsidies," the FCC declared, "is to initiate a Section 208 proceeding at the Commission." *Id.* at 7479–80, ¶ 9.

## II

Global Crossing contends that the FCC's determination, that an IXC must pay a LEC PSP compensation merely upon certification that the LEC has discontinued subsidizing its payphone service, is neither consistent with § 276 of the Telecommunications Act nor the product of reasoned decisionmaking. We consider these two arguments below.

## A

■ In addressing Global Crossing's statutory argument, we apply the two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[6] We first ask "whether Congress has directly spoken to the precise question at issue," in which case we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If, however, the "statute is silent or ambiguous with respect to the specific issue," we move to the second step and defer to the agency's interpretation as long as it is "based on a permissible construction of the statute," *id.* at 843, 104 S.Ct. 2778, and is "reasonable in light of the Act's text, legislative history, and purpose," *Southern Cal. Edison Co. v. FERC,* 116 F.3d 507, 511 (D.C.Cir.1997).

■ Global Crossing asserts that permitting Verizon to receive compensation merely upon its certification that it has discontinued subsidies is inconsistent with the express language of § 276, which requires the Commission to promulgate regulations that "discontinue ... all intrastate and interstate payphone subsidies ... in favor of a compensation plan." 47 U.S.C. § 276(b)(1)(B). That language, Global Crossing argues, "ties the timing of the receipt of compensation to the removal of the subsidies," rendering Verizon unqualified to receive compensation until it first removes all of its subsidies. Reply Br. at 10. By allowing Verizon to rely on certification alone, petitioner continues, the FCC permitted the LEC PSP to receive per call compensation without regard to whether it had in fact discontinued its payphone subsidies.

The FCC does not disagree that § 276 requires Verizon to discontinue subsidies before it may receive compensation. Indeed, the Bureau's decision "emphasize[s] that a LEC's certification letter does not substitute for the LEC's obligation to comply" with the requirements for compensation, and that "LECs must satisfy the requirements ... to be eligible to receive compensation." Bureau Order, 14 FCC Rcd at 16,068, ¶ 28. The Commission rightly notes, however, that the statute is silent regarding the mechanism the FCC should adopt to ensure that the statute's requirements are carried out. *See id.* at 16,065, ¶ 22. That being so, the only question for us is whether, under *Chevron* step two, the FCC's interpretation "is based on a reasonable construction of the statutory term[s]." *Chevron,* 467 U.S. at 840, 104 S.Ct. 2778. And we see nothing unreasonable about the FCC's conclusion that the statute permits it to adopt a certification regime.

---

**6.** In *United States v. Mead Corp.,* the Supreme Court confirmed the applicability of the *Chevron* test to a case like this one, where "Congress delegated authority to the agency generally to make rules carrying the force of law,

and ... the agency interpretation claiming deference was promulgated in the exercise of that authority." —— U.S. ——, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001).

Global Crossing contends that by relying upon certification—upon nothing more than the word of the LEC PSP—the FCC cannot ensure that subsidies have been discontinued "in favor of" compensation, and hence cannot ensure compliance with that statutory requirement. But the FCC does not rely solely upon certification; certification is merely the initial step in the Commission's enforcement scheme. If an IXC believes that a LEC PSP's certification is false or otherwise unsupported, the IXC may file a complaint under § 208 of the Communications Act and, if correct, will recover damages, including its payments and interest thereon. *See* 47 U.S.C. §§ 206–09. Moreover, if a LEC PSP is found to have certified falsely, it faces additional penalties, including fines and forfeitures, in an enforcement action brought by the Commission. *See* 47 U.S.C. §§ 501–04. Taken together, these procedural mechanisms appear reasonably calculated to accomplish the congressional purpose.

Although the enforcement regime chosen by the Commission may not be the only one possible, we must uphold it as long as it is a reasonable means of implementing the statutory requirements. *See New England Tel. & Tel. Co. v. FCC*, 826 F.2d 1101, 1107–08 (D.C.Cir.1987). Certification is the mechanism the FCC employs for a broad range of its other statutory functions.[7] There is nothing about the language or purpose of § 276 to indicate that certification is an inappropriate method of fulfilling the payphone requirements of the Telecommunications Act as well.

### B

In addition to its statutory argument, Global Crossing advances two further arguments that are best characterized as claims that the FCC's certification policy does not represent reasoned decisionmaking. As to these claims, we apply the deferential standard of the Administrative Procedure Act (APA), and will uphold the Commission's policy judgments as long as they are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy that standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

In an argument that largely overlaps with its claims under *Chevron* step two, Global Crossing asserts that the FCC failed to articulate any reasoned basis for relying on a policy of certification. We are not persuaded. As discussed in Part II.A, the Commission reasonably concluded that

7. *See, e.g., Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 92–93 (D.C.Cir.2000) (rejecting a challenge to the FCC's decision to allow undocumented self-certification of compliance with environmental guidelines by FCC license applicants); *CHM Broad. Ltd. P'ship v. FCC*, 24 F.3d 1453, 1455–56 (D.C.Cir.1994) (noting that the FCC uses self-certification to implement the statutory requirement that applicants for radio station licenses demonstrate their financial qualifications); Supplemental Order Clarification, *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 15 FCC Rcd 9587, 9602–03, ¶ 29, 2000 WL 713746 (2000) (clarifying that "incumbent LECs must allow requesting carriers to self-certify" that they meet certain requirements, and noting that "a letter sent to the incumbent LEC by a requesting carrier is a practical method of certification").

certification of compliance, coupled with provisions for complaint and enforcement proceedings, will accomplish the statutory purpose of discontinuing payphone subsidies. At the same time, the FCC reasonably determined that requiring IXCs to pay immediately upon certification for calls routed over their networks will promote certainty in the achievement of Congress' other purpose: " 'ensur[ing] that all payphone service providers are fairly compensated for each and every . . . call.' " Bureau Order, 14 FCC Rcd at 16,064, ¶ 20 (quoting 47 U.S.C. § 276(b)(1)(A)). Global Crossing may be correct in arguing that certainty of compensation can also be ensured by permitting an IXC to decide whether a LEC PSP's proof of compliance is sufficient, and then requiring the LEC to file a complaint with the Commission if it is dissatisfied. But Congress has delegated the authority to make the choice between such alternatives to the FCC, and our only responsibility is to ensure that the choice the FCC has made is a reasonable one.

■■■ Global Crossing also contends that, in requiring payment upon mere certification, the FCC departed from its prior orders and precedents without explanation. It is true that "an agency changing its course by rescinding a rule" or departing from precedent "is obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42, 103 S.Ct. 2856; *see Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970). But it is also true that we must defer to an agency's reading of its own regulations unless that reading is "plainly erroneous or inconsistent with the regulation[s]," *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), and that we must accord deference to an agency's reasonable interpretation of its own precedents, *see Cassell v. FCC*, 154 F.3d 478, 483 (D.C.Cir. 1998). We perceive no unexplained departure from the agency's prior policies here.

To implement § 276(b)(1)(B), the FCC issued an order providing that a LEC PSP "must be able to certify" that it has, inter alia, removed intrastate subsidies before it may receive compensation for calls originating from its payphones. Order on Reconsideration, *Payphone Orders*, 11 FCC Rcd at 21,293, ¶ 131. The Commission's order did not specify the requirements for such certification, but instead delegated to the Common Carrier Bureau the authority to make "any necessary determination as to whether a LEC has complied with all requirements" for compensation. *Id.* at 21,294, ¶ 132. Global Crossing maintains that "to certify" means more than merely to attest to compliance; rather, it requires the LEC PSP to provide the IXC with full proof that it has satisfied all regulatory conditions. The Bureau, however, interpreted the phrase as requiring only attestation, and the FCC confirmed that as the correct construction of the Commission's own language. FCC Order, 15 FCC Rcd at 7479, ¶ 7.

The Bureau's interpretation of the Commission's order is a reasonable one. The Bureau relied upon "the ordinary meaning of the term 'to certify,' " defined by *Black's Law Dictionary* as "the formal assertion in writing of some fact," and by *Webster's* as "to attest as being true." Bureau Order, 14 FCC Rcd at 16,062, ¶ 16 (citing BLACK'S LAW DICTIONARY 227 (6th ed. 1990); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 223 (1989)). It also noted that the Commission has used this meaning of "certify" in other contexts. *Id.* at 16,062–63, ¶ 17 (citing 47 C.F.R. § 1.734(c) (providing that the signature of a party on a pleading "shall be a certificate that . . . to the best of his or her knowledge [the pleading] is well grounded in fact")); *see also CHM Broad. Ltd. P'ship v. FCC*, 24 F.3d 1453, 1455 (D.C.Cir.1994) (noting that an applicant for an FM radio license "certifies" that it has sufficient assets to con-

struct and operate a station by checking "yes" on an FCC form).

The Bureau further observed, correctly, that this interpretation of "to certify" is consistent with decisions issued by the FCC and the Bureau since the promulgation of the initial 1996 *Payphone Orders*. The Bureau pointed out, for example, that the Commission had ruled that LEC PSPs are not required to file a certification with any state or federal regulatory agency, or to obtain a formal certification of compliance from either the states or the FCC, in order to be eligible to receive compensation. Bureau Order, 14 FCC Rcd at 16,-054–55, ¶ 6 (citing Second Report and Order, 13 FCC Rcd at 1780, ¶ 1 n.9). The Bureau also noted that, in its *Intrastate Tariffing Waiver Order*, it specifically refused AT&T's request to declare that "a LEC is not eligible for payphone compensation 'until it has provided proof of state action verifying the LEC's compliance with section 276.'" *Id.* at 16,063, ¶ 18 (quoting 12 FCC Rcd at 21,377, ¶ 16). Instead, the Bureau "reiterated that the Commission's previous orders required only that a LEC 'be able to certify' compliance with the payphone compensation prerequisites." *Id.* (quoting 12 FCC Rcd at 21,380, ¶ 22). And in two further orders, the Bureau declared that "LECs that have certified to the IXC that they comply with the requirements of the *Payphone Orders* must receive per-call compensation." *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 13 FCC Rcd 4998, 5002, ¶ 4, 1998 WL 99371 (1998) (emphasis added); *see also Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 13 FCC Rcd 10,893, 10,899, ¶ 12, 1998 WL 153171 (1998).

In sum, the agency order at issue in this case reflects neither a failure to articulate a reasonable basis for decision, nor a departure from FCC policy and precedent. We therefore find it to be consistent with the APA's standards for reasoned decisionmaking.

## III

■ Global Crossing also challenges the Commission's determination that an IXC seeking to contest the veracity of a LEC PSP's certification must file its own complaint for damages under 47 U.S.C. § 208, and may not assert lack of compliance as an "affirmative defense" to a complaint brought by a LEC PSP. Petitioner contends that by directing it to pay Verizon without considering its defense of noncompliance, the Commission abdicated its "duty to adjudicate issues raised in complaint proceedings." Global Crossing Br. at 12. Citing our opinion in *American Telephone & Telegraph Co. v. FCC*, 978 F.2d 727 (D.C.Cir.1992), Global Crossing argues that by refusing to address its affirmative defense, the FCC breached its duty to consider Global Crossing's claim on the merits.

We do not agree. First, as the FCC points out, there was no failure to consider an "affirmative defense" here because the FCC has not designated noncompliance as an affirmative defense; rather, it is part of the case-in-chief that an IXC must initiate on its own. Second, this approach is not contrary to our ruling in *American Telephone*. In that case, the Commission relied on the validity of an earlier FCC order in dismissing a complaint brought by AT&T against a competitor—without adjudicating AT&T's claim that the order was unlawful. The Commission said that it would instead consider the validity of the order in a new rulemaking. We held that the Commission could not postpone a question concerning the application of existing law by declaring its intent to consider a

future change in that law. The Commission, we said, appeared to be trying to "avoid judicial review" of its order by engaging in "a sort of administrative law shell game." *American Tel. & Tel.,* 978 F.2d at 731–32; *see id.* at 729, 731–32.

Here, however, there is no shell game, because the FCC has made quite clear under which shell the pea lies. The Commission has advised Global Crossing several times that if it wishes to contest Verizon's qualifications for payphone compensation, it should bring a separate action under § 208. And the Commission has also made clear that if Global Crossing brings such an action, it will decide the matter in that forum. Although the Commission does have an obligation to adjudicate claims raised by a party filing a complaint, *see American Tel. & Tel.,* 978 F.2d at 732, it will fulfill that obligation by considering Global Crossing's allegations when they are properly filed.[8]

Nor has Global Crossing been able to articulate how it is disadvantaged by the Commission's requirement that it be a complainant rather than a respondent. As petitioner conceded at oral argument, there is no difference in the allocation of the burden of proof: Although the party that brings a § 208 complaint bears the burden, *see Hi–Tech Furnace Sys., Inc. v. FCC,* 224 F.3d 781, 787 (D.C.Cir.2000), so does a party that asserts an affirmative defense to such a complaint, *see AT&T v. Business Telecom, Inc.,* FCC 01–185, 2001 WL 575527, at ¶ 46 (FCC May 30, 2001). At oral argument, Global Crossing also denied that it would derive any economic benefit from being a respondent rather than a complainant: It noted that because it would recover its payments with interest if it prevailed on a § 208 complaint, there was no difference between asserting non-

compliance as an affirmative defense to nonpayment, and paying upon demand and then filing a complaint to recover. Indeed, Global Crossing even denied that cash-flow considerations made the position of respondent preferable. But if Global Crossing truly has nothing to gain from the alternative for which it presses, and hence suffers no disadvantage from the procedural posture to which the FCC has assigned it, then it would appear to have little basis for complaining about the FCC's decision.

It is well-settled that the Commission "enjoys wide discretion in fashioning its own procedures." *City of Angels Broad., Inc. v. FCC,* 745 F.2d 656, 664 (D.C.Cir. 1984). Section 208 authorizes the FCC to investigate a complaint "in such manner and by such means as it shall deem proper." 47 U.S.C. § 208. More generally, 47 U.S.C. § 154(j) provides that "[t]he Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." Although Global Crossing contends that designation of an issue as part of an affirmative case rather than as an affirmative defense is a matter of substance, not procedure, we disagree. The Supreme Court has interpreted § 154(j) "as explicitly and by implication delegating to the Commission power to resolve subordinate questions of procedure such as the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions." *FCC v. Schreiber,* 381 U.S. 279, 289, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965) (internal quotations omitted). The question of whether an issue is properly desig-

---

8. *See AT&T v. FCC,* 220 F.3d 607, 631 (D.C.Cir.2000) (holding that the FCC may, consistent with *American Telephone,* bar col-

lateral challenges to other FCC orders in proceedings brought to adjudicate applications to provide in-region long distance service).

nated as an affirmative defense falls well within that rubric. *Cf.* FED. R. CIV. P. 8(c) (designating certain issues as "affirmative defenses" rather than "counterclaims"); *AT&T*, 220 F.3d 607, 630 (D.C.Cir.2000) (according deference, in a proceeding under 47 U.S.C. § 271, to the FCC's decision to bar a collateral challenge to a prior FCC order and instead to require the filing of a separate petition for review). And because there is nothing arbitrary about the FCC's decision to require Global Crossing to raise its claim of noncompliance by separate complaint, the Commission's decision "may not be impeached merely because reasonable minds might differ on the wisdom thereof." *Schreiber*, 381 U.S. at 292, 85 S.Ct. 1459.

IV

For the foregoing reasons, Global Crossing's petition for review is denied and the FCC's order on review is

*Affirmed.*