295 F.3d 1326
 UNITED STATES TELECOM ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.
State of Iowa, et al., Intervenors.
 No. 01-1085.
 United States Court of Appeals, District of Columbia Circuit.
 Argued March 12, 2002.
 Decided July 16, 2002.
 
 On Petition for Review of an Order of the Federal Communications Commission.
 William F. Maher Jr. argued the cause for petitioner. With him on the briefs were Lawrence E. Sarjeant, Linda Kent, John W. Hunter, Julie E. Rones, and Stephen Goodman.
 James M. Carr, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the briefs were John A. Rogovin, Deputy General Counsel, and John E. Ingle, Deputy Associate General Counsel.
 Michael D. Hays argued the cause for intervenors State of Iowa and Iowa Telecommunications and Technology Commission. With him on the briefs were J.G. Harrington and Kenneth D. Salomon.
 Before: GINSBURG, Chief Judge, ROGERS and GARLAND, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GARLAND.
 GARLAND, Circuit Judge:
 
 
 1
 The United States Telecom Association (USTA) challenges a Federal Communications Commission (FCC) order finding that the Iowa Communications Network (ICN) is a common carrier. The order makes ICN eligible to receive federal subsidies for providing discounted telecommunications services under the Telecommunications Act of 1996, 47 U.S.C. § 254(h)(1). We first consider whether USTA has standing to bring this suit, and then whether the FCC reasonably classified ICN as a common carrier. We answer both questions in the affirmative and uphold the FCC's order.
 
 
 2
 * ICN was established by the Iowa legislature to provide subsidized high-speed telecommunications services throughout Iowa, especially in areas inadequately covered by local exchange carriers. The governing statute bars ICN from offering services to individuals and to most private businesses. Iowa Code § 8D.11(2) (2001). Instead, ICN's customers are "public and private agencies." Under the statute, "public agency" means: "a state agency, an institution under the control of the board of regents, the judicial branch ..., a school corporation, a city library, a regional library ..., a county library ...[,] a judicial district department of correctional services ..., an agency of the federal government, or a United States post office which receives a federal grant for pilot and demonstration projects." Id. § 8D.2(5). A "private agency" is: "an accredited nonpublic school, a nonprofit institution of higher education eligible for tuition grants, or a [licensed] hospital ... or a physician clinic [for specified services]." Id. § 8D.2(4).[1]
 
 
 3
 Section 254(h)(1) of the Telecommunications Act of 1996 requires a "telecommunications carrier" to provide services at discounted rates to schools, libraries, and rural health care providers. 47 U.S.C. § 254(h)(1). Such a carrier is entitled to receive from the FCC, in an amount equal to the aggregate discount it gives to those entities, either a reimbursement or an offset against the carrier's obligation to participate in or contribute to the universal service fund. Id. The Act defines a "telecommunications carrier" as "any provider of telecommunications services," id. § 153(44), and defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used," id. § 153(46).
 
 
 4
 In 1998, ICN petitioned the FCC for a declaration that it qualifies as a "telecommunications carrier" under the Act, and hence is eligible to receive direct reimbursement for providing services at discounted rates. In 1999, citing its decision in an earlier case, the Commission held that the term "telecommunications carrier" includes only carriers that offer telecommunications on a "common carrier" basis. Federal-State Joint Bd. on Universal Serv., Declaratory Ruling, 14 F.C.C.R. 3040, 3040, 1999 WL 76932 (1999) [hereinafter 1999 Declaratory Ruling] (citing Federal-State Joint Bd. on Universal Serv., Report & Order, 12 F.C.C.R. 8776, 9177-78, 1997 WL 236383 (1997)). To define "common carrier," the FCC turned to the two-pronged test it had previously applied under the Communications Act of 1934, 47 U.S.C. §§ 151 et seq., a test derived from the common law as interpreted in this circuit's case law. Under that test, common carrier status turns on:
 
 
 5
 (1) whether the carrier "holds himself out to serve indifferently all potential users"; and (2) whether the carrier allows "customers to transmit intelligence of their own design and choosing."[2]
 
 
 6
 The FCC ruled that ICN fails to satisfy the first prong because the network does not hold itself out to serve all potential users, but rather is limited by Iowa law to a select clientele. 1999 Declaratory Ruling, 14 F.C.C.R. at 3050-51.[3] The Commission did not reach the second prong of the test.
 
 
 7
 In Iowa v. FCC, 218 F.3d 756 (D.C.Cir. 2000), this court granted Iowa's petition for review and remanded the case to the Commission for further consideration. We held that the FCC had failed to consider Iowa's argument that ICN qualifies as a common carrier, even though its user base is legally restricted, because it offers service to all users that it is authorized by law to serve. See id. at 757. We pointed out that two cases that had considered the meaning of "common carrier" under the Communications Act of 1934 — FCC v. Midwest Video Corp., 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), and National Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630 (D.C.Cir. 1976) ("NARUC I") — "can be read as approving the general rule that a carrier offering its services only to a legally defined class of users may still be a common carrier if it holds itself out indiscriminately to serve all within that class." Iowa, 218 F.3d at 759. Although we made clear that we were "not suggesting that Midwest Video or NARUC ... require[s] a decision in Iowa's favor," we held that "the Commission's failure to address Iowa's argument requires that we remand this matter for the Commission's further consideration." Id. On remand, the FCC reversed its 1999 ruling. The Commission held that ICN is a common carrier, and hence a telecommunications carrier for purposes of § 254(h)(1). In so holding, the Commission concluded that "a carrier offering its services only to a legally defined class of users may still be a common carrier if it holds itself out indiscriminately to serve all within that class." Federal-State Joint Bd. on Universal Serv., Order on Remand, 16 F.C.C.R. 571, 573, 2000 WL 1869492 (2000) [hereinafter 2000 Order]. Finding that ICN does not discriminate among entities within its legally defined user classes, the FCC held that ICN passes the first prong of the common carrier test. See id. at 574-75. It also found ICN to satisfy the second prong, because it "allows customers to transmit intelligence of their own design and choosing." Id. at 575. The Commission therefore declared ICN "eligible to receive direct reimbursement for discounted telecommunications services provided to schools and libraries." Id. at 577.
 
 
 8
 USTA petitions for review of the Commission's order, contending that ICN fails both prongs of the common carrier test. We discuss those contentions in Part III below. In Part II, we first consider whether USTA has standing to bring this case.
 
 II
 
 9
 USTA is a trade association representing local exchange carriers. Its members provide voice, data, and video services over wireline and wireless networks throughout the United States. Although the initial briefs of the FCC and intervenor State of Iowa did not dispute USTA's standing, we have an independent obligation to assure ourselves that the petitioner has constitutional standing to bring this challenge to the FCC's decision. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 1012-13, 140 L.Ed.2d 210 (1998); Liquid Carbonic Indus. Corp. v. FERC, 29 F.3d 697, 701 (D.C.Cir.1994). Accordingly, we directed the parties to submit supplemental briefs on the issue, and, at oral argument, gave USTA a further opportunity to submit affidavits in support of its position. Thereafter, USTA submitted three affidavits, two from individual USTA members and one from the association itself. We have reviewed those affidavits and are satisfied that USTA has made the requisite showing.
 
 
 10
 As a trade association, USTA has standing to sue on behalf of its members if "its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Fund Democracy, LLC v. SEC, 278 F.3d 21, 25 (D.C.Cir. 2002) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)). There is no question that USTA satisfies the latter two conditions; the only question is whether USTA members meet the constitutional requirements for suit in their own right. Those "irreducible constitutional minimum" requirements are:
 
 
 11
 (1) that the plaintiff have suffered an "injury in fact" — an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of — the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
 
 
 12
 Bennett v. Spear, 520 U.S. 154, 167, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997).
 
 
 13
 USTA contends that the FCC's order injures its members by making ICN eligible for a subsidy that permits it to offer lower prices for the same telecommunications services.[4] We have repeatedly recognized that parties "suffer constitutional injury in fact when agencies ... allow increased competition" against them. Louisiana Energy & Power Auth. v. FERC, 141 F.3d 364, 367 (D.C.Cir.1998); see, e.g., Wabash Valley Power Ass'n v. FERC, 268 F.3d 1105, 1113 (D.C.Cir.2001); MD Pharm., Inc. v. Drug Enforcement Admin., 133 F.3d 8, 11 (D.C.Cir.1998). And we have likewise recognized that regulatory decisions that permit subsidization of some participants in a market can have the requisite injurious impact on those participants' competitors. See Exxon Co., U.S.A. v. FERC, 182 F.3d 30, 43 (D.C.Cir. 1999); Liquid Carbonic, 29 F.3d at 701.
 
 
 14
 Nor is the injury to USTA's members "conjectural or hypothetical." The affidavit of one of USTA's members, an independent local exchange carrier, avers that the member has tried to sell its services to a school that currently takes similar services from ICN, but has been unsuccessful because ICN's subsidy enables it to charge substantially lower rates. Whipple Aff. ¶¶ 5-6. The affidavit of another USTA member states that it lost a customer to ICN because the subsidy enabled ICN to charge lower rates for similar services. Kilburg Aff. ¶¶ 5, 7. And an affidavit from USTA, summarizing information it gathered from a survey of its members, avers that other members have had like experiences — either losing business to ICN or being unable to compete for new customers because of ICN's subsidy. Flerl Aff. ¶¶ 4-5.
 
 
 15
 These affidavits show that USTA's members are ready, willing, and able to compete with ICN in providing telecommunications to schools and libraries, and that ICN's subsidy prevents them from doing so on an equal basis. That showing is sufficient to establish that the association's members have suffered cognizable injury in fact. See DynaLantic Corp. v. Department of Defense, 115 F.3d 1012, 1016 (D.C.Cir.1997). And it is also sufficient to satisfy the remaining two requirements of constitutional standing: The competitive injury suffered by USTA's members is fairly traceable to the FCC's decision to render ICN eligible for the subsidy, and that injury would likely be redressed by a favorable decision of this court vacating the FCC's order. See High Plains Wireless, L.P. v. FCC, 276 F.3d 599, 605 (D.C.Cir.2002); Exxon, 182 F.3d at 43; Liquid Carbonic, 29 F.3d at 701. We therefore conclude that USTA has constitutional standing to seek judicial review of the order on behalf of its members.
 
 III
 
 16
 USTA contends that ICN cannot satisfy either prong of the common carrier test, and that the FCC therefore erred in finding ICN eligible for reimbursement from universal service funds. The association also argues that the FCC's order is not entitled to a deferential standard of review because it rests on an interpretation of this circuit's Iowa, NARUC, and other decisions, rather than on an interpretation of a statute. We disagree, and conclude that we must review the agency's order with deference.
 
 
 17
 At bottom, the FCC's order rests not on judicial precedent but on its interpretation of the term "telecommunications carrier" in the Telecommunications Act of 1996. The Commission interprets the term as the equivalent of "common carrier" under the Communications Act of 1934, a term which was itself previously defined by a two-pronged test derived from the common law as construed by this circuit. USTA does not dispute the FCC's decision to interpret "telecommunications carrier" as "common carrier," or its decision to define the latter through the two-pronged test. Indeed, we have previously upheld the FCC's approach as a reasonable construction of an ambiguous statutory term. See Iowa, 218 F.3d at 757 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); Virgin Islands Tel. Corp. v. FCC, 198 F.3d 921, 922, 925-26 (D.C.Cir.1999).
 
 
 18
 In deciding that ICN satisfies the requirements of the common carrier test, the FCC further elaborated upon the meaning of "common carrier," and then applied its version of the two-pronged test to the facts of ICN's situation. Where a statute is "ambiguous with respect to [a] specific issue," the only question for this court is whether the agency's interpretation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. We also defer to an agency's reasonable interpretation of its own rules and precedents. See Global Crossing Telecomms., Inc. v. FCC, 259 F.3d 740, 746 (D.C.Cir.2001); Cassell v. FCC, 154 F.3d 478, 484 (D.C.Cir.1998). And we give deference as well to an agency's application of its statutory and administrative interpretations to specific circumstances — asking only whether such applications are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Global Crossing, 259 F.3d at 747; Cassell, 154 F.3d at 483 n. 4; Huls America Inc. v. Browner, 83 F.3d 445, 452 (D.C.Cir.1996). Finally, where an agency has adopted a judicial test as its own, we likewise review its application of that test only to determine whether it is unreasonable or arbitrary and capricious. See Independent Petroleum Ass'n of Am. v. Babbitt, 92 F.3d 1248, 1257-58 (D.C.Cir.1996) (noting convergence of Chevron and arbitrary and capricious review where agency adopts court decision as its rule).
 
 
 19
 In the following sections, we apply this deferential standard of review to the two challenges that USTA levels against the FCC's order.
 
 
 20
 * USTA's first contention is that, because Iowa law greatly restricts the universe of the network's authorized users, ICN fails to satisfy the first prong of the common carrier test: that the carrier hold itself out to serve indifferently "all potential users." 1999 Declaratory Ruling, 14 F.C.C.R. at 3050. USTA argues that, under our opinion in NARUC I, a carrier cannot satisfy this prong unless it holds itself out to "the public." See NARUC I, 525 F.2d at 640. And ICN's "class of legally authorized users," USTA maintains, "is not broad enough to be considered a portion of `the public.'" Pet'r Br. at 11.
 
 
 21
 In response to this argument below, the FCC determined that "legal restrictions on eligibility to use a carrier's services do not necessarily preclude common carrier status," and that this proposition is consistent with NARUC I. 2000 Order, 16 F.C.C.R. at 573. We agree. As we said in Iowa, our decision in NARUC I "can be read as approving the general rule that a carrier offering its services only to a legally defined class of users may still be a common carrier if it holds itself out indiscriminately to serve all within that class." Iowa, 218 F.3d at 759.
 
 
 22
 In NARUC I, this court held that mobile radio operators known as Specialized Mobile Radio Systems (SMRS) were not foreclosed from common carrier status — even though "SMRS offer a service that may be of practical use to only a fraction of the population," and even though an FCC order "limit[ed] possible subscribers to SMRS services to eligibles" under three specific sections of the FCC's regulations. NARUC I, 525 F.2d at 642 (emphasis added). "The key factor," we said, "is that the operator offer indiscriminate service to whatever public its service may legally and practically be of use." Id. (emphasis added).[5] As the FCC noted, this passage from NARUC I "directly supports" its conclusion in the instant case. 2000 Order, 16 F.C.C.R. at 573.
 
 
 23
 USTA counters, however, that the list of authorized ICN users is so much more restricted than was the list of SMRS eligibles that ICN's list "cannot be considered the public" and ICN cannot qualify as a common carrier. Pet'r Br. at 11. We do not agree. Authorized ICN users include state agencies, institutions under the control of the board of regents, the judicial branch, schools, libraries, departments of correctional services, federal agencies, certain post offices, certain nonprofit institutions of higher education, licensed hospitals, and physician clinics (for some purposes). See Iowa Code § 8D.2(4)-(5). Together, these amount to at least 500 discrete entities. See 2000 Order, 16 F.C.C.R. at 574. Moreover, the network's end-users are all those who can access ICN at authorized facilities — a group that includes students, library patrons, and state and federal employees, and that potentially extends to all Iowans. See Iowa Admin.Code § 751-7.5(8D).
 
 
 24
 Like the list of authorized ICN users, the list of eligible SMRS subscribers in NARUC I was legally circumscribed. The FCC limited SMRS subscribers to "eligibles under Sections 89, 91 and 93 of the Regulations." NARUC I, 525 F.3d at 642. Those included local governments, police and fire departments, motor carriers, taxicab companies, and other specified commercial and noncommercial entities in need (primarily) of dispatch services. See id. at 634, 639, 642-43.[6] Although we do not have enough information to count the number of eligible SMRS subscribers, the SMRS list is not any more readily characterizable as "the public" than is the list of those eligible to use ICN. See NARUC I, 525 F.2d at 634 (characterizing class of eligible SMRS subscribers as "a limited group of users"). In any event, it is certainly not arbitrary for the FCC to regard the two situations as comparable.
 
 
 25
 USTA also argues that ICN cannot qualify as a common carrier because Iowa bars the network's use for "profitmaking venture[s]." Iowa Admin.Code § 751-14.1(8D)(1)(a). NARUC I, however, does not impose a for-profit requirement on common carriers. Instead, USTA points to "this Court's guidance in NARUC II," Pet'r Br. at 15, an opinion stating that price discrimination by cable system operators in favor of noncommercial users did not necessarily preclude those operators from common carrier status — "at least if not carried to the point of excluding all commercial users." National Ass'n of Regulatory Util. Comm'rs v. FCC, 533 F.2d 601, 609 (D.C.Cir.1976) ("NARUC II"). USTA's argument rests solely on the quoted phrase, and puts more weight on that phrase than either its words or the NARUC II opinion as a whole can bear.
 
 
 26
 First, the quoted phrase concerned the operators' voluntary decision to engage in price discrimination; NARUC II was not a case in which either discrimination or exclusion was mandated by law. Second, the phrase served at most as dictum in the opinion, since NARUC II was also not a case in which price discrimination effectively excluded all commercial users. Finally, the portion of NARUC II cited by the petitioner is not the opinion of "this Court," but rather the opinion of Judge Wilkey alone.[7] Although we have subsequently approved some of the views expressed by Judge Wilkey in NARUC II, see Southwestern Bell Tel. Co. v. FCC, 19 F.3d 1475, 1480 (D.C.Cir.1994), we have never held that a carrier is barred from common carrier status unless it is authorized to serve commercial users. Indeed, given NARUC I's declaration that the key factor in determining common carriage is whether the carrier offers "indiscriminate service to whatever public its service may legally and practically be of use," 525 F.2d at 642 (emphasis added), we have no warrant for concluding that the exclusion of commercial users from ICN's network compels the Commission to disqualify it as a common carrier.
 
 
 27
 USTA further purports to discern significant inconsistencies between the FCC's order and the Supreme Court's decision in FCC v. Midwest Video Corp., 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). Succeeding on that argument, however, is an uphill struggle in light of our statement in Iowa that Midwest Video, like NARUC I, "can be read as approving the general rule that a carrier offering its services only to a legally defined class of users may still be a common carrier." 218 F.3d at 759. Nonetheless, USTA contends that Midwest Video supports its claim that ICN fails the first prong of the common carrier test because ICN's class of authorized users both is too small and excludes profit-making ventures.
 
 
 28
 Midwest Video, however, said nothing about either of these issues. Indeed, to the extent the case is relevant at all, it is by implication only and in that respect supports the FCC. In Midwest Video, the Supreme Court considered FCC regulations requiring cable television systems to allocate channels for educational, government, public, and leased access users. The regulations mandated that the public and leased access channels be open to all users, but that the educational channel be dedicated to "local educational authorities" and the government channel be dedicated to "local government." 47 C.F.R. § 76.254(a)(2), (3) (1977). The Supreme Court held that the access rules effectively "relegated cable systems, pro tanto, to common-carrier status" — an action the Court held to be beyond the authority of the Commission. 440 U.S. at 700-01, 99 S.Ct. at 1441-42; see id. at 708-09, 99 S.Ct. at 1445-46.
 
 
 29
 On its face, Midwest Video is substantially more helpful to the FCC than to USTA. As we noted in Iowa, the Midwest Video Court found that the FCC's regulations had effectively transformed the cable systems into common carriers, notwithstanding that "use of the educational and government access channels was limited respectively to `local educational authorities' and the `local government'" and that a "private organization could not air an educational program on the educational access channel because it would not come within the class of users authorized by law." 218 F.3d at 758. Thus, like the Iowa Code, the FCC regulations at issue in Midwest Video narrowly defined the class of authorized users for each channel and barred profit-making enterprises from using the government and educational channels. Undaunted by these similarities, USTA contends that the Supreme Court did not analyze the regulations on a channel-by-channel basis, but instead considered them as a unit that included not only the nonprofit channels but also the public and leased access channels that were available to the general public. Nothing in the Midwest Video opinion, however, suggests that the Court relied on the existence of the public channels to reach its conclusion about common carriage. Instead, the Court focused on the fact that the regulations required the cable systems to offer use of the allocated channels to all who qualified for them on a nondiscriminatory basis, and deprived the systems of the power to select individual users or to control the programming of those who qualified. See Midwest Video, 440 U.S. at 699-702, 99 S.Ct. at 1440-42. Accordingly, nothing in Midwest Video supports USTA's claim that the list of ICN users is too narrowly delineated for the network to qualify as a common carrier.
 
 
 30
 Finally, USTA argues that to affirm the FCC's decision here would be to accept that a carrier may be designated as "common" even if it has only a single authorized user. That is hardly the case, and it is certainly not this case. Regardless of whether the FCC could label a single-user network as a common carrier without being arbitrary and capricious, the Commission's determination that ICN — with its far broader customer base — qualifies as a common carrier constitutes a reasonable application of the test the Commission has adopted to define that term.
 
 B
 
 31
 USTA's second contention is that ICN cannot satisfy the second prong of the common carrier test because it does not allow customers to "transmit intelligence of their own design and choosing." 1999 Declaratory Ruling, 14 F.C.C.R. at 3050. This prong of the test is intended to confine common carrier status to operators that do not regulate the content of their customers' communications. Although USTA concedes that "ICN does not specify the individual words or messages sent over the network," Pet'r Br. at 17, it argues that Iowa nonetheless restricts users' communications because its regulations require them to adopt policies acknowledging that: (1) "[t]he use of the network must be consistent with the written mission of the authorized user," and (2) "[t]he network... cannot be used for a profit-making venture." Iowa Admin.Code § 751-14.1(8D)(1)(b), (a).
 
 
 32
 The FCC rejected this argument in its order, concluding that these restrictions are "intended to acknowledge the statutorily-prescribed customer base, rather than to limit the `intelligence' [customers] may transmit over the network." 2000 Order, 16 F.C.C.R. at 575. "The effect of this limitation," the FCC continued, is merely "to restrict the use of the ICN to the primary purpose for which the network exists." Id. at 575-76. The Commission accepted ICN's representations that it does not police the content that a user transmits, and instead places the responsibility on the user to determine whether its use of the network is consistent with its written mission statement. See id. at 576. The FCC further noted that "ICN states, and no party disputes, that it has never denied or cut off service on the basis of an acceptable use issue." Id. (internal quotation marks omitted).
 
 
 33
 These considerations persuade us that the FCC reasonably concluded that ICN meets the second prong of the common carrier test. As we held in Part III.A, Iowa's limitation of ICN's services to specified categories of eligible users is consistent with the network's status as a common carrier. A requirement that users adhere to the missions that make them statutorily eligible is therefore also consistent, as it represents nothing more than a method of enforcing that limitation. Indeed, in NARUC I we held that SMRS' common carrier status was not precluded by the fact that the governing regulations "require that SMRS applicants certify that they will not provide service to ineligibles." 525 F.2d at 642. Similarly, the requirement that users adopt policies stating that ICN "cannot be used for a profit-making venture" represents nothing more than an acknowledgment that use of the network is limited to nonprofits, a limitation that we also upheld in Part III.A. Moreover, beyond the implicit condition that a user's mission be one that qualifies for network eligibility, ICN places no limits on the scope of a user's written mission statement and no restrictions on a user's ability to change its mission statement.
 
 
 34
 USTA once again turns to Midwest Video for support in its attack on the FCC's order, but again that case offers only further support for the Commission's decision. USTA points out that, when the Supreme Court ruled that the cable access regulations imposed common carrier obligations on cable operators, it stated that "[o]perators are prohibited from determining or influencing the content of access programming" — a prohibition USTA claims is breached by the Iowa regulations recounted above. Midwest Video, 440 U.S. at 702, 99 S.Ct. at 1442. But the Court's statement was made in a context that demonstrates that it did not regard the restriction of users to their authorized missions as the kind of content control that precludes common carrier status. As we have already noted, under the regulations at issue in Midwest Video, "use of the educational and government access channels was limited respectively to `local educational authorities' and the `local government,'" and a "private organization could not air an educational program on the educational access channel because it would not come within the class of users authorized by law." Iowa, 218 F.3d at 758. Moreover, Midwest Video's more complete description of the prohibition on content control in that case makes it plain that the Court did not regard the exclusion of commercial content as inconsistent with common carriage: "System operators," the Court said, "are specifically enjoined from exercising any control over the content of access programming except that they must adopt rules proscribing the transmission on most access channels of ... commercial matter." 440 U.S. at 693, 99 S.Ct. at 1438 (emphasis added).
 
 
 35
 In sum, we find that the FCC reasonably concluded that ICN does permit its customers to "transmit intelligence of their own design and choosing." As the FCC held, the regulations highlighted by USTA do not control the content of communications, but rather merely "acknowledge the statutorily-prescribed customer base." 2000 Order, 16 F.C.C.R. at 575.
 
 IV
 
 36
 In ruling that ICN is a "telecommunications carrier" eligible for subsidies under § 254(h)(1), the FCC reasonably interpreted the language of its governing statute, and reasonably construed and applied the test it had previously adopted to give meaning to that language. Accordingly, USTA's petition for review is
 
 
 37
 
 Denied.
 
 
 
 
 Notes:
 
 
 [1]
 Iowa law divides "public and private agencies" into two further subcategories: "certifying users," which are higher education institutions, area education agencies, and certain post offices; and "preauthorized users," which are all other public and private agencies. Certifying users must obtain specific legislative authorization to connect to the network unless they certified their intention to connect by July 1, 1994, and must take all of their telecommunications services from ICN unless they obtain a statutory waiver. Preauthorized users may choose whether to connect to ICN and which services to take from itSee id. § 8D.9; Iowa Admin.Code § 7517.1(8D) (2001). ICN will serve any qualifying user that requests service. See Iowa v. FCC, 218 F.3d 756, 757-58 (D.C.Cir.2000).
 
 
 [2]
 1999 Declaratory Ruling, 14 F.C.C.R. at 3050 (quotingSouthwestern Bell Tel. Co. v. FCC, 19 F.3d 1475, 1480 (D.C.Cir.1994), and citing National Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 640-41 (D.C.Cir.1976) ("NARUC I"), and National Ass'n of Regulatory Util. Comm'rs v. FCC, 533 F.2d 601, 608-09 (D.C.Cir.1976) ("NARUC II")); see Federal-State Joint Bd. on Universal Serv., Order on Remand, 16 F.C.C.R. 571, 573, 576, 2000 WL 1869492 (2000) (noting common-law origins of test).
 
 
 [3]
 The FCC also held that ICN further fails the first prong because it does not hold itself out to serve even that select group "indifferently," but instead treats each of the subcategories of ICN users according to different terms fixed by the legislature. 1999 Declaratory Ruling, 14 F.C.C.R. at 3051;see supra note 1 (describing subcategories). In light of the FCC's subsequent characterization of this holding on appeal, we concluded in Iowa v. FCC, 218 F.3d 756 (D.C.Cir.2000), that it was not an independent basis for denying ICN common carrier status. Rather, it was equivalent to the FCC's holding that offering "service only to the class of users authorized by law to receive it is inconsistent with being a common carrier." Id. at 760. On remand, the FCC reversed itself and found "persuasive ICN's position that while its enabling statute may discriminate among various classes of users, it does not allow ICN to discriminate among entities within each class of users." Federal-State Joint Bd. on Universal Serv., Order on Remand, 16 F.C.C.R. 571, 574, 2000 WL 1869492 (2000). The FCC thus held that ICN does treat its authorized users "indifferently," id. at 575, and USTA has not appealed that ruling.
 
 
 [4]
 USTA also maintains that its members suffer injury because, if ICN is improperly reimbursed for providing discounted telecommunications, insufficient universal service funds will be left to reimburse USTA members. Because we find that USTA's "competitive injury" theory satisfies the requirements of standing, we do not address this alternative theory
 
 
 [5]
 InNARUC I, we eventually upheld the FCC's determination that it could treat SMRS as non-common carriers because there was no evidence that they would indifferently serve all eligible customers. See id. at 643-44.
 
 
 [6]
 Parts 89, 91, and 93 of the FCC's regulations listed specific types of eligible subscribers for three categories of private radio service: "Public Safety," "Industrial," and "Land Transportation."See, e.g., 47 C.F.R. § 89.251 (1975) (local government); id. § 89.301 (police); id. §§ 89.501-89.519 (special emergency users); id. § 89.551 (state guards); id. § 91.301 (petroleum radio service); id. § 91.351 (forest products radio service); id. § 93.251 (motor carriers); id. § 93.351 (railroads); id. § 93.506 (contract road service vehicles); id. § 98.401 (taxicabs).
 
 
 [7]
 See NARUC II, 533 F.3d at 621 (Lumbard, J., concurring) (deeming it "unnecessary to reach" common carriage question); id. at 634 (Skelly Wright, J., dissenting) (accepting only "arguendo" that cable operators were common carriers).