MICHEL, Chief Judge.
This is a trade case concerning the interplay between the North American Free Trade Agreement Implementation Act, Pub.L. No. 103-182, 107 Stat. 2057 (1993) (codified at 19 U.S.C. §§ 3301-3473) (“NAFTA Implementation Act” or “NIA”), and the Continued Dumping and Subsidy Offset Act, Pub.L. No. 106-387, § 1003, 114 Stat. 1549, 1623 (2000) (“CDSOA”), repealed by the Deficit Reduction Act of 2005, Pub.L. No. 109-171, § 7601(b), 120 Stat. 4, 154 (2006). We heard argument on December 4, 2007.
The NIA was enacted in 1993. Section 408 of that act provides that any subsequent amendment to certain United States trade laws “shall apply to goods from a NAFTA country only to the extent specified in the amendment.” 19 U.S.C. § 3438. The CDSOA, enacted in 2000, amended the trade laws by providing that antidumping and countervailing duties assessed on imported goods — which previously had been placed into the general fund of the United States Treasury— would instead be “distributed on an annual basis ... to the affected domestic producers for qualifying expenditures.” 19 U.S.C. § 1675c (2000). Following enactment of the CDSOA, United States Customs and Border Protection (“Customs”) began distributing duties assessed on imported goods, including on goods imported from NAFTA countries Canada and Mexico, to domestic producers.
In 2005, Plaintiffs-Appellees Canadian Lumber Trade Alliance, Norsk Hydro Canada, Inc., Canadian Wheat Board, Ontario Forest Industries Association, Ontario Lumber Manufacturers Association, The Free Trade Lumber Council (together, the “Canadian Producers”), and Plaintiff-Cross Appellant the Government of Cana *1325 da sued the United States in the Court of International Trade, alleging that because the CDSOA does not specify that it applies to goods from NAFTA countries, it must be construed (in light of section 408 of the NIA) not to apply to goods from NAFTA countries. The Plaintiffs sought, inter alia, a declaratory judgment interpreting the CDSOA in their favor, and an injunction against Customs’ continued distribution of duties assessed on softwood lumber, magnesium, and hard red spring wheat from Canada.
Defendants-Appellants Coalition for Fair Lumber Imports Executive Committee, U.S. Magnesium LLC, United States Steel Corp., U.S. Foundry & Manufacturing Co., Neenah Foundry Co., Municipal Castings, Inc., LeBaron Foundry, Inc., East Jordan Iron Works, Inc., Allegheny Ludlum Corp., and AK Steel Corp. (together, the “Domestic Producers”) intervened in the litigation, arguing (along with the United States) that the Plaintiffs lacked standing to challenge Customs’ CDSOA distributions, had no cause of action, and were wrong on the merits in any event. After briefing and an evidentiary hearing, the Court of International Trade held that the Canadian Producers had standing and a cause of action, that the Government of Canada did not have standing because it had elected to proceed in the World Trade Organization (“WTO”), and that the merits favored the Canadian Producers. Canadian Lumber Trade Alliance v. United States, 425 F.Supp.2d 1321 (Ct. Int’l Trade 2006) (“CLTA /”). The Court of International Trade issued a declaratory judgment holding the CDSOA inapplicable to goods from Canada and Mexico, and granted an injunction against Customs’ further distribution of duties assessed on softwood lumber, magnesium, and hard red spring wheat from Canada. Canadian Lumber Trade Alliance v. United States, 441 F.Supp.2d 1259 (Ct. Int’l Trade 2006) (“CLTA 77”).
The United States and the Domestic Producers now appeal the judgment in favor of the Canadian Producers, and the Government of Canada cross-appeals the judgment against it and dismissal of its claims for lack of standing. We have jurisdiction over these appeals under 28 U.S.C. § 1295(a)(5). We affirm the declaratory judgment issued by the Court of International Trade, because at least one Plaintiff-Appellee has standing to seek it, and because the Court of International Trade properly interpreted the CDSOA, in light of section 408 of the NIA, to be inapplicable to goods imported from Canada or Mexico. We also affirm the Court of International Trade’s dismissal of the Government of Canada’s claims for lack of standing, though we hold that Canada’s institution of WTO proceedings did not determine this outcome. Finally, we modify the injunction issued by the Court of International Trade so that it pertains only to hard red spring wheat, because subsequent events have rendered this case moot with respect to the softwood lumber and magnesium industries.
BACKGROUND

A. Relevant Provisions of the NAFTA Implementation Act

The United States entered into the North American Free Trade Agreement (“NAFTA”) with Canada and Mexico in December of 1992. Congress passed the NIA in November 1993, President Clinton signed the bill on December 8, 1993, and the NIA was made effective on January 1, 1994. Pub.L. No. 103-182, 107 Stat. 2057 (1993). Section 101 of the NIA contains Congress’s approval of the NAFTA treaty, providing that “the Congress approves— (1) the North American Free Trade Agreement. ...” 19 U.S.C. § 3311(a) (emphasis added). Section 102 of the NIA provides that “[n]o person other than the United *1326 States — (1) shall have any cause of action or defense under — (A) the Agreement [i.e., NAFTA][1] or by virtue of Congressional approval thereof-” 19 U.S.C. § 3312(c) (emphasis added).
Section 408 of the NIA, entitled “[treatment of amendments to antidumping and countervailing duty law,” lies at the center of this appeal. The entire section reads as follows:
Any amendment enacted after the Agreement [i.e., NAFTA] enters into force with respect to the United States that is made to—
(1) section 303 or title VII of the Tariff Act of 1930 [19 USCS §§ 1671 et seq.], or any successor statute, or
(2) any other statute which—
(A) provides for judicial review of final determinations under such section, title, or successor statute, or
(B) indicates the standard of review to be applied,

shall apply to goods from a NAFTA country only to the extent specified in the amendment.

19 U.S.C. § 3438 (emphasis added).
As the Court of International Trade recognized, section 408 of the NIA is a “magic words” rule. “[A]ny amendment to title VII of the Tariff Act of 1930 must contain certain ‘magic words’ for Congress to indicate that it intends to alter antidumping and countervailing duty laws with respect to NAFTA parties.” CLTA I, 425 F.Supp.2d at 1334.

B. The Continued Dumping And Subsidy Offset Act

In 2000, Congress enacted the CDSOA (often referred to as the “Byrd Amendment”). Before passage of the CDSOA, “the duties collected pursuant to the anti-dumping statute were deposited with the Treasury for general purposes.” Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1379 (Fed.Cir.2003). The CDSOA changed this by providing that “[d]uties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures.” 19 U.S.C. § 1675c(a) (2000). In other words, the CDSOA “direct[ed] Customs to pay the collected anti-dumping duties to [domestic producers] harmed by the anticompetitive conduct” rather than to keep the duties within the government. Huaiyin Foreign Trade Corp., 322 F.3d at 1380.
The CDSOA directed the Commissioner of Customs to establish a “special account” for each antidumping or countervailing duty order, and to deposit into each special account all duties collected after October 1, 2000 “under the antidumping order or finding or the countervailing duty order with respect to which the account was established.” 19 U.S.C. § 1675e(e)(2) (2000).[2] Every year, the special accounts were to be distributed to “affected domestic producers”[3] who had incurred and *1327 claimed “qualifying expenditures.” [4]
As the Court of International Trade observed, the CDSOA “does not specify that it applies to goods from Canada or Mexico ... nor did the United States provide advance notice of the [CDSOA] to Canada or Mexico or engage in consultations with regard thereto.” CLTA I, 425 F.Supp.2d at 1329. Soon after enactment of the CDSOA, nine countries, including Canada and Mexico, instituted dispute resolution proceedings against the United States in the World Trade Organization, arguing that the CDSOA violated a range of international agreements. A WTO dispute resolution panel, affirmed by the Appellate Body of the WTO, ruled that the United States acted inconsistently with the Uruguay Round Agreements in enacting the CDSOA, and as a remedy authorized the complaining nations to retaliate against the CDSOA by suspending tariff concessions on imports from the United States. See Panel Reports, United States-Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/R, WTDS234/R (Sept. 16, 2002); Appellate Body Reports, United States-Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/AB/R, WTDS234/AB/R (Jan. 16, 2003).
Congress repealed the CDSOA as part of the Deficit Reduction Act of 2005, which was signed into law on February 8, 2006. See Pub.L. No. 109-171, 120 Stat. 4, 154 (2006). The repeal was made effective as of October 1, 2007, but provided that Customs may still distribute “duties on entries of goods made and filed before October 1, 2007.” Id. § 7601(b).
At various times between enactment of the CDSOA and its repeal, antidumping and countervailing duty orders were in place on softwood lumber, magnesium, and hard red spring wheat from Canada.[5] Pursuant to the CDSOA, Customs distributed duties collected under these anti-dumping and countervailing duty orders, including duties collected on goods produced or sold by the Canadian Producers, to domestic producers for fiscal years 2003, 2004, and 2005. The approximate amounts of CDSOA distributions were as follows; for softwood lumber from Canada, about $73,000 for 2003, $5.38 million for 2004, and $3.28 million for 2005; for magnesium from Canada, about $7,800 for 2003, $63,400 for 2004, and $25,500 for 2005; and for hard red spring wheat from Canada, about $127,600 for 2005.[6]

*1328
C. Proceedings Below

On April 29, 2005, the Canadian Producers and the Government of Canada filed a total of five complaints against the United States and Customs in the Court of International Trade,[7] alleging that Customs’ distribution of duties assessed on imports from Canada was an unlawful agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 702, because the CDSOA, when properly interpreted in light of section 408 of the NIA, does not apply to goods from Canada. Each complaint asked the court to issue a declaratory judgment interpreting the CDSOA and to issue an injunction against further distribution of particular duties. Most of the Complaints also asked the court to instruct Customs to “collect back” particular duties from the domestic producers to whom they had been distributed.[8]
In June of 2005, the parties in each case filed a motion to consolidate the cases.[9] In July of 2005, the Domestic Producers filed motions to intervene, which were granted, and the United States and Domestic Producers moved to dismiss each of the complaints under Court of International Trade Rule 12(b)(1) (lack of subject matter jurisdiction) and Court of International Trade Rule 12(b)(5) (failure to state a claim upon which relief can be granted).
The Court of International Trade granted the motions for consolidation, and the Canadian Producers and Government of Canada moved for summary judgment. The Court of International Trade then construed these motions, as well as the United States’ and Domestic Producers’ motions to dismiss, as motions for summary judgment or judgment on the agency record. See Ct. Int’l Trade Rules 56, 56.1. On March 27 and 28, 2006, the court held a hearing “to resolve any disputed facts related to jurisdiction,” CLTA I, 425 F.Supp.2d at 1333. At the hearing, the court heard testimony from two fact witnesses, including Neal Fisher, Administrator of the North Dakota Wheat Commission (the only “affected domestic producer” to receive CDSOA distributions of duties assessed on hard red spring wheat from Canada). The court also heard from two expert witnesses, a professor of Economics and a professor of Business Administration, who offered competing views of the likely effects of CDSOA distributions on market conditions.
On April 7, 2006, the Court of International Trade issued an opinion holding that (1) the Canadian Producers had standing because they were likely to be economically injured by the challenged CDSOA distributions and were asserting interests within the “zone of interest” of section 408 of the NIA; (2) the Government of Canada did not have standing because it had elected to pursue a remedy for the challenged CDSOA distributions in the WTO and had been awarded a remedy there; (3) the Canadian Producers had a cause of action under the APA; and (4) Customs’ distribu *1329 tion of duties assessed on imports from Canada was unlawful, because the CDSOA must be read in light of section 408 of the NIA not to apply to goods from Canada or Mexico. CLTA I, 425 F.Supp.2d at 1321.
After further briefing concerning remedies, the Court of International Trade issued a second opinion on July 14, 2006, along with a judgment (1) granting the Canadian Producers’ motion for judgment on the agency record; (2) denying the Government of Canada’s motion for judgment on the agency record; (3) denying the Domestic Producers’ and United States’ motions for judgment on the agency record as against the Canadian Producers, and granting those motions as against the Government of Canada; (4) dismissing the Government of Canada’s complaint; (5) declaring that pursuant to section 408 of the NIA, the CDSOA does not apply to antidumping and countervailing duties assessed on imports of goods from Canada or Mexico; and (6) enjoining Customs from making any continued CDSOA distributions to the extent they derive from duties assessed pursuant to countervailing duty orders, antidumping duty orders, or findings under the Antidumping Act of 1921, upon softwood lumber, magnesium, or hard red spring wheat from Canada. CLTA II, 441 F.Supp.2d at 1259; Ct. Int’l Trade Consol. Ct. No. 05-00324, slip. op. 06-104 (Judgment, Jul. 14, 2006). The Court of International Trade declined to instruct Customs to “collect back” any duties already distributed, however. The United States and Domestic Producers then filed timely appeals, and the Government of Canada filed a timely cross-appeal.

D. Developments Outside the Proceedings Below

During and after pendency of the proceedings below, a number of important developments occurred in the softwood lumber, magnesium, and hard red spring wheat industries. Developments after July 14, 2006, are not reflected in the record before the Court of International Trade, but we may consider them insofar as they bear on issues such as mootness. Cf. Borlem S.A-Empreedimentos Industriais v. United States, 913 F.2d 933, 939 (Fed.Cir.1990) (“[A] reviewing court is not precluded ... from considering events which have occurred between the date of an agency (or trial court) decision and the date of decision on appeal.”).
1. Softwood Lumber
On September 12, 2006, about two months after the Court of International Trade rendered judgment in this case, the United States and Canada signed the Softwood Lumber Agreement 2006 (“SLA 2006”). See Softwood Lumber Agreement Between the Government of Canada and the Government of the United States of America, art. Ill (Sept. 12, 2006), as amended by Agreement Between the Government of the United States of America and the Government of Canada Amending the Softwood Lumber Agreement Between the Government of the United States of America and the Government of Canada Done at Ottawa on 12 September 2006 (Oct. 12, 2006).
On October 12, 2006, pursuant to the SLA 2006, the United States revoked the antidumping and countervailing duty orders on softwood lumber from Canada, effective retroactively to their May 22, 2002 issue date, “without the possibility of reinstatement.”[10] The Department of *1330 Commerce also instructed Customs to “cease collecting cash deposits [of anti-dumping and countervailing duties], as of October 12, 2006, on imports of softwood lumber products from Canada,” to liquidate all unliquidated entries subject to the revoked orders without regard to anti-dumping or countervailing duties, and to “refund all deposits collected on such entries with accrued interest” to the importers of record.[11]
2. Magnesium
On July 6, 2006, shortly before entry of the Court of International Trade’s judgment below, Customs revoked the countervailing duty orders on pure and alloy magnesium from Canada.[12] On October 31, 2006, Norsk Hydro Canada, Inc., the only Canadian Producer in the magnesium industry, announced plans to close its only magnesium plant in Canada during the first half of 2007.
3. Hard Red Spring Wheat
On February 16, 2006, Customs revoked the antidumping and countervailing duty orders on hard red spring wheat from Canada, effective January 2, 2006.[13] The North Dakota Wheat Commission, the only “affected domestic producer” to receive CDSOA distributions derived from duties collected under these orders, was the only entity to claim “qualifying expenditures” pertaining to these orders for fiscal year 2006.[14] According to counsel for the United States, the North Dakota Wheat Commission could obtain up to $180,000 in further distributions under the CDSOA, but for the Court of International Trade’s judgment in this case.[15]
DISCUSSION

A. Standard of Review

We review the Court of International Trade’s interpretation of a statute, which is a matter of law, de novo. Brother Int’l Corp. v. United States, 464 F.3d 1319, 1324 (Fed.Cir.2006). We review the court’s factual determinations for clear error. Better Home Plastics Corp. v. United States, 119 F.3d 969, 971 (Fed.Cir.1997). “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed.Cir.2001) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).
We review Article III standing, a threshold jurisdictional issue and a question of law, de novo, see S. Cal. Fed. S & L *1331 Ass’n v. United, States, 422 F.3d 1319, 1328 (Fed.Cir.2005), but “[t]o the extent jurisdictional facts are in dispute, however, the findings of fact are reviewed for clear error.” Hamlet v. United States, 873 F.2d 1414, 1416 (Fed.Cir.1989).
When reviewing a decision of the Court of International Trade in a suit brought pursuant to 28 U.S.C. § 1581(i), we apply the standard of review set forth by the Administrative Procedure Act, and will “hold unlawful and set aside [Customs’] action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2); Dixon Ticonderoga Co. v. United States, 468 F.3d 1353, 1354 (Fed.Cir.2006).

B. Standing

The Constitution “limits the judicial power of the United States to the resolution of ‘Cases’ and ‘Controversies.’ ” Hein v. Freedom Religion Found., Inc., — U.S. -, 127 S.Ct. 2553, 2562, 168 L.Ed.2d 424 (2007) (quoting U.S. Const, art. Ill, § 2, cl. 1). There is no case or controversy within the meaning of the Constitution unless the plaintiff has standing, as the Supreme Court has explained.
[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an “injury in fact” — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not “conjectural” or “hypothetical.” Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be “fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.”
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).
Because standing is “an indispensable part of the plaintiffs case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof.” Id. at 561,112 S.Ct. 2130. Allegations alone may suffice to establish standing at the pleading stage, but must be supported with evidence at later stages of the litigation. Id.; accord DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 126 S.Ct. 1854, 1861 n. 3, 164 L.Ed.2d 589 (2006) (“the party asserting federal jurisdiction when it is challenged has the burden of establishing it”).
Beyond this “irreducible constitutional minimum” of Article III standing, a plaintiff who brings claims under the Administrative Procedure Act (“APA”) must also have prudential standing. As the Supreme Court has explained, prudential standing concerns “the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).
Here, the Court of International Trade held that the Canadian Producers possess standing, but that the Government of Canada does not because it elected to seek a remedy for its injury in the World Trade Organization. CLTA I, 425 F.Supp.2d at 1335-54. On appeal, the Domestic Producers and the United States argue that the Canadian Producers have neither constitutional nor prudential standing, while the Government of Canada argues on cross-appeal that it possesses both *1332 types. We affirm that the Government of Canada lacks standing, though not because it instituted WTO proceedings, and we affirm that the Canadian Wheat Board has standing. We need not address the standing of any other Plaintiff because, even assuming that the other Canadian Producers had standing in the Court of International Trade, their claims are now moot as we discuss below.
1. Canadian Wheat Board — Article III Standing
The parties frame their constitutional-standing dispute as a question of whether empirical evidence was necessary to demonstrate injury-in-fact in this case, or whether the Court of International Trade was correct to invoke the doctrine of “competitor standing,” which relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiffs competitors. See, e.g., Clinton v. City of New York, 524 U.S. 417, 433, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (The Supreme Court “routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III ‘injury-in-fact’ requirement],” and any party “who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this part of the standing test.” (citing 3 K. Davis & R. Pierce, Administrative Law Treatise 13-14 (3d ed.1994))). See also Ass’n of Data Processing Serv. Orgs., Inc., 397 U.S. at 152, 90 S.Ct. 827 (holding that data processing companies had standing to challenge a ruling by the Comptroller of the Currency allowing banks to provide data processing services); accord Arnold Tours, Inc. v. Camp, 400 U.S. 45, 46, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); Investment Co. Institute v. Camp, 401 U.S. 617, 620, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (“[I]t is urged at the outset that petitioners lack standing to question whether national banks may legally enter a field in competition with them. This contention is foreclosed by [Data Processing ].”).
Here, the Canadian Producers alleged that they (or their constituent members) compete directly with United States producers to whom (or to whose surrogates) Customs distributed money under the CDSOA. By using antidumping and countervailing duties imposed on Canadian goods to subsidize these U.S. competitors rather than for some other purpose, the Canadian Producers argued, Customs made it very likely that the Canadian Producers would suffer economic injury in the form of increased competition. To support this argument, the Canadian Producers presented expert testimony to the Court of International Trade concerning the types of economic injury that were likely to result from government subsidization of a competitor. The United States and Domestic Producers presented countervailing expert testimony, but the Court of International Trade was “persuaded by the Canadian Producers’ arguments that there will likely be some injury as a result of the distributions.” CLTA I, 425 F.Supp.2d at 1347.
On appeal, the United States and Domestic Producers argue that the Court of International Trade erred by failing to require an empirical analysis linking specific CDSOA distributions to specific, demonstrated economic harms (e.g., lost sales, decreased market share). Only with such an analysis, this argument proceeds, could the Canadian Producers have proven an injury-in-fact that is “concrete and particularized,” and “actual or imminent, not ‘conjectural’ or ‘hypothetical.’ ” Lujan, 504 U.S. at 560,112 S.Ct. 2130.
We do not agree. One purpose of the injury-in-fact requirement, as the Court of *1333 International Trade explained, is “to ensure that the plaintiffs have a stake in the fight and will therefore diligently prosecute the case ... while, at the same time, ensuring that the claim is not abstract or conjectural so that resolution by the judiciary is both manageable and proper.” CLTA I, 425 F.Supp.2d at 1336 (citing United Food & Cornmer. Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 556, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996)) (other citations omitted). Therefore, as the Third Circuit has noted, “[i]n-jury-in-fact is not Mount Everest.” Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 294 (3d Cir.2005). Rather, a plaintiff may establish its injury-in-fact “in the same way as any other matter on which the plaintiff bears the burden of proof.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130.
Here, the Court of International Trade conducted a two-day evidentiary hearing devoted to the question of injury-in-fact. The Canadian Producers needed only to establish that it was more likely than not they would be injured by the challenged CDSOA distributions, and they could fairly employ economic logic toward that end even though empirical analysis might conceivably have provided a higher level of certainty.[16] See Adams v. Watson, 10 F.3d 915, 923 (1st Cir.1993) (“[B]asic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and probable market behavior. Indeed, most ‘competitor standing’ cases depend on such core economic postulates.”) (emphasis in original).[17]
Although the doctrine of “competitor standing” is not yet well-developed in our Circuit, we note that the D.C. Circuit repeatedly has applied the doctrine to hold that “parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.” La. Energy & Power Auth. v. FERC, 141 F.3d 364, 367 (D.C.Cir.1998). See also New World Radio, Inc. v. FCC, 294 F.3d 164, 172 (D.C.Cir.2002) (explaining that D.C. Circuit applies “ ‘competitor standing’ doctrine to an agency action that itself imposes a competitive injury, i.e., that provides benefits to an existing competitor or expands the number of entrants in the petitioner’s market.”) (emphasis added); U.S. Telecom Ass’n v. FCC, 295 F.3d 1326, 1331 (D.C.Cir.2002) (“regulatory decisions that permit subsidization of some participants in a market can have the requisite injurious impact on those participants’ competitors”).
In this case, the Canadian Wheat Board is not a textbook candidate for “competitor standing,” but the doctrine is instructive nonetheless. The Canadian Wheat Board sells hard red spring wheat. The North Dakota Wheat Commission, the only recipient of the CDSOA distributions chal *1334 lenged by the Canadian Wheat Board (i.e., the antidumping and countervailing duties assessed on hard red spring wheat from Canada), is an organization which “promotes the sale of [hard red spring] wheat on behalf of farmers in North Dakota and sponsors research on [hard red spring] wheat,” but does not itself sell wheat. CLTA I, 425 F.Supp.2d at 1348 (emphasis added). Cf. Adams, 10 F.3d at 922 (competitor standing is “premised on a plaintiffs status as a direct competitor whose position in the relevant marketplace would be affected adversely by the challenged governmental action”) (emphasis in original). Further, the research sponsored by the North Dakota Wheat Commission is non-proprietary, and thus may inure to the benefit of the Canadian Wheat Board as well as North Dakota wheat producers.
However, the Court of International Trade found that the North Dakota Wheat Commission’s promotional activities have “helped to take back market share from Canadian Wheat in specific export markets,” CLTA I, 425 F.Supp.2d at 1348, and the United States and Domestic Producers have not established that this factual finding was clearly erroneous. Loss of market share is certainly an economic injury,[18] and it is quite rational to infer that Customs, by distributing money to an entity that aims to take away market share from Canadian wheat and has already been somewhat successful in that effort, is likely to inflict further economic injury on the Canadian Wheat Board. Indeed, fewer inferences are required to find injury-in-fact in this case than in most “competitor standing” cases, where it is presumed (i.e., without affirmative findings of fact) that a boon to some market participants is a detriment to their competitors.
The United States and Domestic Producers argue that the North Dakota Wheat Commission has yet to spend any of the money it has received under the CDSOA, and that therefore any injury to be suffered by the Canadian Wheat Board as a result of CDSOA distributions is not an “imminent” injury as required by Article III. We disagree. The Administrator of the North Dakota Wheat Commission testified that the reason this money has yet to be spent is “the continued uncertainty involved” in this litigation, and that “[d]ue to that uncertainty, [the wheat commissioners] told us to place [the money] in the cash reserve and leave it alone until we had more certainty.” The United States and Domestic Producers cannot rely on the pendency of this lawsuit to argue that a threatened harm is not imminent. See, e.g., Eckles v. City of Corydon, 341 F.3d 762, 768 (8th Cir.2003) (“The City has stated that it will only abstain from enforcing the notice while the suit is pending ... [and] if the suit is dismissed Eckles could expect the City to enforce the notice.... [Therefore] [t]he threat of injury to Eckles is imminent and concrete.”).
Because the Court of International Trade was correct to conclude, given its findings of fact, that Customs’ distribution of money to the North Dakota Wheat Commission under the CDSOA was likely to cause an economic injury to the Canadian Wheat Board, and because this injury would be prevented by a declaratory judgment and injunction against such distribution, the Court of International Trade was correct to hold that the Canadian Wheat Board has constitutional standing to seek declaratory and injunctive relief.
2. Canadian Wheat Board — prudential standing
The Court of International Trade was also correct to hold that the *1335 Canadian Wheat Board has prudential standing under the APA. A plaintiff has prudential standing if “the interest sought to be protected by the [plaintiff] is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.” Ass’n of Data Processing Serv. Orgs., Inc., 397 U.S. at 154. The Supreme Court has explained that this “zone of interest” test “is not meant to be especially demanding,” and, “[i]n cases where the plaintiff is not itself the subject of the contested regulatory action,” the test is satisfied unless “the plaintiffs interests are so marginally related to or inconsistent with the purposes implicit in the statute-that it cannot reasonably be assumed that Congress intended to permit the suit.” Clarke v. Sec. Indus. Ass’n, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987).
Here, although the Canadian Wheat Board alleges a violation of the CDSOA, the Canadian “Wheat Board seeks the protection of section 408 of the NIA. We have explained that “[b]y passing the NAFTA Implementation Act, Congress ... created for importers of goods from one of the three signatory countries the right to preferential tariff treatment.” Xerox Corp. v. United States, 423 F.3d 1356, 1364 (Fed.Cir.2005). Section 408 embodies one form of preferential tariff treatment — it conditions, on specific legislative pronouncement, the United States’ ability to amend certain trade laws as applied to “goods from a NAFTA country.” See 19 U.S.C. § 3438; CLTA I, 425 F.Supp.2d at 1354 (“[T]he apparent purpose of Section 408 is to protect Canadian and Mexican importers from some statutory alterations of the competitive environment contemplated by the antidumping and countervailing duty laws in effect as of January 1, 1994.”) The Canadian Wheat Board markets goods from Canada, a NAFTA country, and therefore has an interest in preferential tariff treatment. Its interests are clearly not “so marginally related to or inconsistent with the purposes implicit in [section 408] that it cannot reasonably be assumed that Congress intended to permit the suit.” Clarke, 479 U.S. at 399, 107 S.Ct. 750.
The United States and Domestic Producers assert that neither the NIA nor its legislative history evidences any Congressional intent to give foreign producers a right to sue for violations of section 408. But “there need be no indication of congressional purpose to benefit the would-be plaintiff,” Clarke, 479 U.S. at 399-400, 107 S.Ct. 750, because the review provisions of the APA are “generous.” Ass’n of Data Processing Serv. Orgs., Inc., 397 U.S. at 156, 90 S.Ct. 827. Therefore, we affirm that “there are no prudential standing restraints to bar [the Canadian Wheat Board’s] claims here.” CLTA I, 425 F.Supp.2d at 1354.

S. Government of Canada^-Article III Standing

We also affirm that unlike the Canadian Wheat Board, the Government of Canada does not have standing, though we do not rely on the Court of International Trade’s analysis to reach this result. First, we note that the Government of Canada disclaims derivative standing — i.e., standing based on injury to the Canadian Producers — and argues instead that it is independently injured by the challenged CDSOA distributions. The Court of International Trade concluded that, even assuming such injury, the Government of Canada does not have standing here because it elected to challenge the CDSOA in the WTO and was successful in that forum. CLTA I, 425 F.Supp.2d at 1351 (“by pursuing its action before the WTO, Canada has elected this remedy at the expense of others”).
On appeal, both the Government of Canada and the United States argue *1336 that the Court of International Trade’s reliance on election was erroneous. We agree. Election may arise in the jurisdictional context if a plaintiff is entitled to prosecute a claim in one of two fora. Having chosen one forum, the plaintiff may not proceed on the same claim in the other forum. See, e.g., Bonneville Assocs. v. United States, 43 F.3d 649, 653 (Fed.Cir. 1994) (“Courts have consistently interpreted the [Contract Disputes Act] as providing the contractor with an either-or choice of forum. Thus, once a contractor makes a binding election to appeal the [contracting officer’s] final decision to a board of contract appeals or to the Court of Federal Claims, the contractor can no longer pursue its claim in the other forum.”) (internal citation omitted).
Here, however, the Government of Canada does not seek to litigate the same claim in two fora. In the WTO, Canada joined with nine other countries to claim that Congress’ passage of the CDSOA violated a range of international agreements signed by the United States. See Dispute Resolution Body, Panel Reports, United States-Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/R, WTDS234/R (Sept. 16, 2002); Appellate Body, Appellate Body Reports, United States-Continued Dumping and Subsidy Offset Act of 2000, WT/DS217/AB/R, WTDS234/AB/R (Jan. 16, 2003). In this case, by contrast, the Government of Canada claims that Customs’ distribution of certain duties to domestic producers violates domestic law (i.e., the CDSOA itself, when properly interpreted in light of section 408 of the NIA). The Court of International Trade was not deprived of jurisdiction over Canada’s statutory claim merely because Canada had chosen to enforce international agreements in the WTO. Cf. Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 76, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998) (“In rejecting the argument that the doctrine of election of remedies barred the Title VII lawsuit, we reasoned that a grievance is designed to vindicate a ‘contractual right’ under a [collective bargaining agreement], while a lawsuit under Title VII asserts ‘independent statutory rights accorded by Congress.’ ” (explaining Court’s holding in Alexander v. Gardner-Denver Co., 415 U.S. 36, 39, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974))).
Nevertheless, the burden still falls on the Government of Canada to show that it has standing — independent of any injury to the Canadian Producers — to challenge Customs’ interpretation of the CDSOA. The Government of Canada advances three theories of standing, none of which are sufficient under Article III.
First, the Government of Canada argues that it is injured by the denial of its statutorily granted rights under section 408 of the NIA, and that Congress has granted Canada a “procedural right” to standing under the Court of International Trade’s jurisdictional statute, 28 U.S.C. § 1581(i)(4) (which provides that the Court of International Trade has exclusive jurisdiction over actions against the United States that “arise[ ] out of any law of the United States providing for ... administration and enforcement with respect to” tariffs and duties on imports). Canada relies on Massachusetts v. EPA, in which the Supreme Court held that the state of Massachusetts had standing to challenge the Environmental Protection Agency’s denial of Massachusetts’ rulemaking petition (seeking federal regulation of automobile greenhouse gas emissions under the Clean Air Act). — U.S. -, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). The Court held that Massachusetts had standing in part because Congress had enacted a “procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious,” in 42 U.S.C. § 7607(b)(1) (which provides that “[a] petition for review of *1337 action of [certain EPA decisions] ... may be filed only in the United States Court of Appeals for the District of Columbia”). EPA, 127 S.Ct. at 1454. Here, the Government of Canada asserts, Congress has enacted an analogous “procedural right” in 28 U.S.C. § 1581(i)(4), under which Canada has standing to enforce section 408 of the NIA.
However, the Supreme Court in EPA stressed that the result in that case depended heavily on “the special position and interest of Massachusetts,” and explained that “States are not normal litigants for the purposes of invoking federal jurisdiction.” EPA, 127 S.Ct. at 1454.
When a State enters the Union, it surrenders certain sovereign prerogatives. Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercise of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted.

Id.

The Government of Canada is not fairly analogous to a State of the Union in this analysis. Although Canada surely made concessions to the United States in negotiating the NAFTA treaty,[19] Canada has not truly surrendered any sovereign prerogatives, such as the ability to negotiate a resolution of this dispute with the United States or the ability to defend itself. Therefore the Government of Canada is not entitled to “special solicitude in [the] standing analysis,” as was given to Massachusetts. EPA, 127 S.Ct. at 1455.
Canada’s second theory of standing fails for similar reasons. Analogizing itself to Native American tribes, the Government of Canada argues that it has standing because it is a sovereign seeking to protect its sovereign interests. But to the extent that Native American tribes are entitled to any “special solicitude” regarding standing, here the Government of Canada has not established that it is similarly situated. See, e.g., United States v. Creek Nation, 295 U.S. 103, 110, 55 S.Ct. 681, 79 L.Ed. 1331 (1935) (tribe “was in a state of tutelage and entitled to rely on the United States, its guardian, for needed protection of its interests”); Begay v. Albers, 721 F.2d 1274, 1281 (10th Cir.1983) (“the United States Government, out of solicitude for the welfare of its Indian wards, undertook by Treaties, statutes and executive orders to establish legal relations to protect the Indian wards”).
Finally, the Government of Canada argues that even if its sovereignty does not confer special status for purposes of standing, Canada has still been deprived of the benefit of section 408 of the NIA, and is as entitled as an individual or corporation to challenge regulatory action that interferes with enjoyment of bargained-for benefits. The problem with this theory is that, having disclaimed reliance on any economic injury to the Canadian Producers, the Government of Canada does not explain what benefit it has been deprived of — i.e., what injury it has suffered. Cf. Columbia Broad. Sys., Inc. v. United States, 316 U.S. 407, 413, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942) (complaint alleged that “appellant’s ability to conduct its business and maintain its public broadcasting service is seriously impaired and the [challenged] regulations will make the operation of appellant’s business more costly, reduce its earnings and render its property and business less valuable”); Idaho Power Co. v. FERC, 312 F.3d 454, 460 (D.C.Cir.2002) (explaining that because “contract duration is a meas *1338 ure of value,” appellant “suffered a cognizable injury when it was compelled to forgo a 10-year contract ... and instead enter a shorter-term contract with its associated market risks”).
Because the Government of Canada has not demonstrated an injury-in-fact independent of injury to the Canadian Producers, and is not entitled to special solicitude that would temper the injury-in-fact requirement, the Government of Canada does not have independent standing under Article III to challenge Customs’ interpretation of the CDSOA.[20]

C. Mootness

Though standing and the “case or controversy” requirement are most frequently analyzed with respect to the initiation of litigation, “[t]he standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.” Arizonans for Official English v. Arizona, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). If a plaintiffs claims cease to present a “case or controversy” due to developments during litigation, those claims become moot. “One commentator has defined mootness as ‘the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).’ ” U.S. Parole Comm’n v. Geraghty, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)); see also Lewis v. Cont’l Bank Corp., 494 U.S. 472, 478, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (plaintiff “must continue to have a personal stake in the outcome of the lawsuit”) (internal citation omitted).
Here, the Domestic Producers argue that the claims of Canadian Producers in the softwood lumber and magnesium industries are moot. The Canadian Lumber Trade Association and Norsk Hydro Canada, Inc. do not contest this argument.[21] We agree that, even assuming the Canadian Producers in the softwood lumber and magnesium industries had standing in the Court of International Trade under the doctrine of “competitor standing,” their claims have been mooted by subsequent developments.
In their complaints below, the softwood lumber and magnesium Canadian Producers asked the Court of International Trade for both prospective relief (a declaratory judgment and an injunction), and retrospective relief (instructions to Customs to “collect back” duties already distributed). However, the Court of International Trade granted only prospective relief, see CLTA II, 441 F.Supp.2d at 1268, and the Canadian Producers have not cross-appealed the court’s denial of retrospective relief. Therefore, each Canadian Producer only “continue[s] to have a personal stake in the outcome of the lawsuit” if there are any duties, assessed on goods from Canada, that have yet to be distributed to a competitor of that Canadian Producer under the CDSOA, and that would be distributed but for the judgment below.
The Canadian Producers in the softwood lumber industry cannot meet this standard because there are no longer any duties on softwood lumber from Canada remaining *1339 to be distributed under the CDSOA. Pursuant to the SLA 2006, Customs has retroactively revoked the antidumping and countervailing duty orders on softwood lumber from Canada, liquidated all relevant entries without collecting antidump-ing or countervailing duties, and refunded all such duties in Customs’ possession to the importers of record. With no threat of further challenged distributions, there is no threat of further injury to the Canadian Producers in the softwood lumber industry. Therefore we hold that the claims of the Canadian Lumber Trade Alliance, Ontario Forest Industries Association, Ontario Lumber Manufacturers Association, and The Free Trade Lumber Council for declaratory and injunctive relief are moot.
The sole Canadian Producer from the magnesium industry, Norsk Hydro Canada, Inc., cannot show a continued “personal stake” in this suit for a different reason. Having chosen to exit the magnesium industry, Norsk Hydro Canada will no longer compete with “affected domestic producers” of magnesium. Even if there are duties assessed on magnesium from Canada that remain to be distributed by Customs under the CDSOA, Norsk Hydro Canada can no longer argue that it will likely suffer competitive injury as a result of those distributions. Therefore, we hold that the claims of Norsk Hydro Canada, Inc. for declaratory and injunctive relief are moot.
No party has argued that the claims of the Canadian Wheat Board are moot, and counsel for the United States represented at oral argument that but for the Court of International Trade’s judgment below, Customs could further distribute as much as $180,000 to the North Dakota Wheat Commission under the CDSOA. Therefore, we hold that the claims of the Canadian Wheat Board for declaratory and in-junctive relief are not moot, and we turn to the substance of this dispute. See Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (only one plaintiff need have standing for a court to consider the case); accord Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm’rs, 802 F.Supp. 1223, 1231 (D.N.J.1992) (“To obtain injunctive or declaratory relief, it is sufficient that there be at least one plaintiff with standing.”).[22]

D. Cause of Action

We next consider whether the Canadian Wheat Board has a cause of action. The Domestic Producers argue that even assuming standing, the claims of the Canadian Wheat Board are barred by section 102(c) of the NIA, which provides that “[n]o person other than the United States — (1) shall have any cause of action or defense under — (A) the Agreement or by virtue of Congressional approval thereof....” 19 U.S.C. § 3312(c). As noted above, the Canadian Wheat Board instituted this suit under section 702 of the Administrative Procedure Act (“APA”).
The APA confers a general cause of action upon persons “adversely affected or aggrieved by agency action within the meaning of a relevant statute,” 5 U.S.C. § 702, but withdraws that cause of action to the extent the relevant statute “[precludes] judicial review,” 5 U.S.C. *1340 § 701(a)(1). Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.
Block v. Cmty. Nutrition Inst, 467 U.S. 340, 345, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).
Beginning with express statutory language, we observe that section 102(c) of the NIA bars claims brought “under ... the Agreement or by virtue of Congressional approval thereof.” 19 U.S.C. § 3312(c). The Domestic Producers contend that the phrase “by virtue of Congressional approval thereof’ refers to the entire NIA, including section 408, and therefore bars the Canadian Wheat Board’s suit. But the express language of the NIA refutes this position, and makes clear that “Congressional approval” refers only to section 101 of the NIA and not to the entire act. Section 2 of the NIA defines “Agreement” to mean “the North American Free Trade Agreement approved by the Congress under section 101(a).” 19 U.S.C. § 3301 (emphasis added). Section 101, in turn, provides that “the Congress approves — (1) the North American Free Trade Agreement....” 19 U.S.C. § 3311(a) (emphasis added). Therefore section 102(c)’s bar against causes of action based on “the Agreement or by virtue of Congressional approval thereof,” reads most naturally as barring only those suits brought under NAFTA itself or under section 101 of the NIA. Because this suit does not rely on NAFTA itself or section 101 of the NIA, but rather on section 408 of the NIA, the suit is not barred by section 102(c).
The structure of the NIA does not weigh against this conclusion. The Domestic Producers argue that because the NIA was enacted through the “fast track” process — wherein Congress combines into a single “implementing bill” its approval of a trade agreement and any legislation necessary to implement the United States’ obligations under the agreement — therefore the phrase “Congressional approval” must be construed to refer to the entirety of the bill. But even the law governing the “fast track” mechanism carefully distinguishes between Congressional “approval” and other, substantive provisions of an implementing bill, explaining that an implementing bill for a trade agreement must contain both “a provision approving such trade agreement,” and “if changes in existing laws or new statutory authority is required to implement such trade agreement ..., provisions, necessary and appropriate to implement such trade agreement ..., either repealing or amending existing laws or providing new statutory authority.” 19 U.S.C. § 2191(b)(1) (emphasis added).
In the case of the NIA, section 101 is clearly the “provision approving” NAFTA, while section 408 is a provision changing existing law to implement a requirement of NAFTA; namely, NAFTA Art. 1902.2(a), which provides in part that while each NAFTA party “reserves the right to change or modify its antidumping law or countervailing duty law,” such changes “shall apply to goods from another [NAFTA] Party only if the amending statute specifies that it applies to goods from that Party or from the Parties to this Agreement.” Compare § 408 of the NIA (certain subsequent amendments “shall apply to goods from a NAFTA country only to the extent specified in the amendment”).
The Domestic Producers also argue that their interpretation of section 102(c) is supported by the legislative history of a parallel provision in an earlier bill implementing the Canadian Free Trade Agreement (“CFTA,” a precursor to NAFTA). *1341 In particular, they point to a Senate Report stating that section 102(c) of the CFTA Implementation Act “deal[s] with the question of whether this Agreement [i.e., CFTA] or this bill creates a private right of action to challenge Government action on the ground that it is inconsistent with the obligations of the United States under the Agreement.” CAFTA Implementation Act, S.Rep. No. 100-509, at 11 (1988), U.S.Code Cong. & Admin.News 1988, pp. 2395, 2405-06 (emphasis added). Here, however, the Canadian Producers do not base their claims on the obligations of the United States “under [an] Agreement” (in this case, NAFTA), but on the obligations of the United States under domestic law; namely, section 408 of the NIA. More importantly, the legislative history of the NIA — the statute actually at issue here — supports the Court of International Trade’s construction. See Statement of Administrative Action (“SAA”), H.R. Doc. No. 103-159(1), at 450, 462 (explaining that section 102(c) of the NIA precludes “private right[s] of action based on the NAFTA, or on Congressional approval of the Agreement in section 101(a)”) (emphasis added); H.R.Rep. No. 103-361(1), at 18 (1993), r&printed in 1993 U.S.S.C.A.N. 2552, 2568 (section 102(c) contains a “general prohibition on private right[s] of action arising from the NAFTA, the supplemental agreements, or approval of the NAFTA by Congress under section 101(a) of the bill ”) (emphasis added).
The Domestic Producers further argue that their interpretation of section 102(c) is supported by past judicial consideration of a parallel provision in the Uruguay Round Agreements Act (“URAA”).[23] In Bronco Wine Co. v. United States Department of Treasury, 997 F.Supp. 1318 (E.D.Cal.1997), a district court considered section 102(c) of the URAA, which provides that no person except the United States “shall have any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement.” 19 U.S.C. § 3512(c). The district court held that this section “clearly and unambiguously states that there may be no action by a private party, brought under any law, to enforce [the] provisions [of the URAA].” Bronco Wine, 997 F.Supp. at 1322. The Ninth Circuit affirmed in an unpublished opinion, writing that the plaintiffs claims were barred because “no one other than the United States shall have a cause of action under the [Uruguay Round] Agreement.” Bronco Wine Co. v. BATF, No. 98-15444, 168 F.3d 498, 499, 1999 WL 68632, 1999 U.S.App. LEXIS 2130, at *2 (9th Cir. Feb. 11,1999), cert. denied, 528 U.S. 950, 120 S.Ct. 371, 145 L.Ed.2d 290 (1999) (brackets in original, emphasis added, internal quotation omitted) (unpublished).
It appears that the Ninth Circuit in Bronco Wine may have conflated the URAA with the Uruguay Round Agreements, affirming the district court’s dismissal of claims brought under the URAA on the grounds — true but irrelevant — that section 102(c) bars claims brought under the Agreements themselves. Compare NSK Ltd. v. United States, 346 F.Supp.2d 1312, 1322 (Ct. Int’l Trade 2004) (holding that where plaintiff challenged Commerce’s interpretation of a United States statute, section 102(c) of the URAA was an “erroneous technical bar” that did not prohibit the suit). But in any event, we do not find the Bronco Wine decision regarding the URAA to be persuasive in the context of the NIA, particularly given the clear language of the NIA itself, as discussed above. Therefore we hold that sec *1342 tion 102(c) of the NIA does not bar the Canadian Wheat Board’s cause of action here.
E. Merits — Interpretation of the CDSOA
Having held that the Canadian Wheat Board has standing and a cause of action, we turn finally to the merits of its claim that the CDSOA must be read, in light of section 408 of the NIA, not to apply to goods from Canada or Mexico. To review, section 408 provides in relevant part that “[a]ny amendment enacted after the Agreement [i.e., NAFTA] enters into force with respect to the United States that is made to ... title VII of the Tariff Act of 1930 ... shall apply to goods from a NAFTA country only to the extent specified in the amendment.” 19 U.S.C. § 3438. It is quite clear that the CDSOA, enacted six years after the NIA, amended title VII of the Tariff Act of 1930. See Pub.L. No. 106-387, § 1003(a), 114 Stat. 1549, 1549A-73 (enacting the CDSOA) (“Title VII of the Tariff Act of 1930 is amended by inserting after section 753 the following new section.... ”). It is also clear that the CDSOA does not specifically refer to NAFTA, the NIA, Canada, or Mexico. See id.; 19 U.S.C. § 1675c (2000). Therefore, the Court of International Trade concluded, “based on Congress’ plain language in Section 408 [of the NIA], Customs is not authorized to apply the [CDSOA] to goods from Canada or Mexico.” CLTA I, 425 F.Supp.2d at 1373.
The Domestic Producers now offer a barrage of arguments against this result. Most, if not all, were well-addressed and rejected by the Court of International Trade in its exhaustive opinion, see id. at 1366-73, and we adopt that court’s reasoning and conclusions here without repeating all of them. Broadly, the Domestic Producers argue that the CDSOA is not subject to the “magic words” rule of section 408 because (1) the CDSOA does not “apply to goods” within the meaning of section 408; (2) the CDSOA supercedes section 408; or (3) the CDSOA is an exercise of Congress’ spending power and cannot be challenged by foreign entities.
Starting with the words of section 408, the Domestic Producers contend that the statute affects subsequent trade amendments only insofar as they “apply to goods,” and that the CDSOA falls outside this reach because it applies to money (i.e., duties assessed on imported goods) rather than to goods. But while it is true that the CDSOA does not regulate goods directly, such as by flatly prohibiting their sale or use, the CDSOA surely does “apply to goods” in the sense relevant to anti-dumping and countervailing duty laws, which are designed to regulate the market for goods in an attempt to compensate for anti-competitive behavior. See, e.g., Dixon Ticonderoga Co. v. United States, 468 F.3d 1353, 1356 (Fed.Cir.2006) (“it is true that the CDSOA is intended to protect domestic producers”). And it is exactly the anti-dumping and countervailing duty laws that are circumscribed by section 408. See SAA, H.R. Doc. No. 103-159(1), at 203 (1993). (“Section 408 of the bill implements the requirement of Article 1902 [of NAFTA] that amendments to the AD and CVD laws shall apply to a NAFTA country only if the amendment so states explicitly.”). Therefore the CDSOA does not escape section 408 merely by virtue of the language, “apply to goods.”[24]
*1343 The Domestic Producers next argue that although the CDSOA does not specify that it applies to goods from NAFTA countries, neither does the statute specify that it does not so apply, and therefore we must infer from this silence that Congress intended the CDSOA to apply to goods from NAFTA countries regardless of section 408 of the NIA. In other words, the Domestic Producers claim that Congress’ silence was the result of a deliberate judgment to supercede section 408 (or at least that section 408 was inapplicable). But we have explained that “[f]or a later statute to be held implicitly to supercede an apparently inconsistent earlier enactment, the intent of Congress must be apparent in the circumstances.” Sw. Marine of San Francisco, Inc. v. United States, 896 F.2d 532, 533 (Fed.Cir.1990); cf. United States v. United Cont’l Tuna, 425 U.S. 164, 168, 96 S.Ct. 1319, 47 L.Ed.2d 653 (“It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored.”). Here, the much simpler inference to draw from Congress’ silence—and the only reasonable inference, if we are to draw one at all—is that Congress, being aware of its earlier enactment of section 408 of the NIA,[25] chose not to supercede section 408 nor to exempt the CDSOA from it.
Indeed, this simpler inference is bolstered by the fact that Congress was not silent when, years before the CDSOA, Congress enacted a different statute amending title VII of the Trade Act of 1930; namely, the URAA. See Pub.L. No. 103-465, 108 Stat. 4901 (URAA § 234) (1994) (“Pursuant to article 1902 of the North American Free Trade Agreement and section 408 of the North American Free Trade Agreement Implementation Act, the amendments made by this title shall apply with respect to goods from Canada and Mexico.”). Given that Congress had demonstrated its ability to specify a statute’s applicability to NAFTA parties—-and indeed to make explicit reference to section 408—it is unreasonable to infer that Congress meant for the CDSOA to apply to Canadian and Mexican goods but also decided that a specific reference to this effect was unnecessary.
Finally, the Domestic Producers argue that the CDSOA was enacted as part of an appropriations bill, and was therefore an exercise of Congress’ spending power that was only tangentially related to title VII of the Tariff Act of 1930 and is outside the reach of section 408. Once antidumping and countervailing duties are assessed, the Domestic Producers claim, those duties become the property of the United States, to dispose of as the United States chooses without interference by foreign entities. This argument has no traction, however, because the Canadian Wheat Board does not challenge Congress’ spending authority or its choices thereunder. Rather, the Canadian Wheat Board challenges Customs’ distribution of duties on the ground that they are inconsistent with Congress’s intention as expressed in the CDSOA and section 408 of the NIA.
It is true that the CDSOA directs Customs to distribute money that has been received into the United States Treasury, and in this sense the statute bears the hallmark of a spending bill. But it is certainly not a general appropriation. The statute specifically directs the creation of “special accounts,” separate from the Treasury’s general fund, and provides that assessed duties are to be deposited into the special accounts and distributed therefrom to affected domestic producers. 19 U.S.C. *1344 § 1675c(e) (2000). Duties only reach the Treasury’s general fund, if at all, after an antidumping or countervailing duty order has been revoked and money remains unclaimed in the corresponding special account for ninety days thereafter. Id. § 1675c(e)(4) (2000).
Further, as the Court of International Trade correctly observed, “the language of Section 408 does not speak to the type of Congressional authority invoked, but to the laws to which amendments are to be made.” CLTA I, 425 F.Supp.2d at 1373. Though Congress might have exercised its spending power to assist domestic producers without also amending title VII of the Tariff Act of 1930, and though the Canadian Wheat Board might not have had any recourse to challenge Customs’ actions in that event, Congress did in fact choose to enact the CDSOA as an amendment to the trade laws, subject to the constraints imposed by section 408 of the NIA. Therefore the Canadian Wheat Board does in fact have recourse to challenge Customs’ actions in this case.
CONCLUSION
We AFFIRM the Court of International Trade’s judgment granting the motion of the Canadian Wheat Board for judgment on the agency record, and denying the motions of the United States and Domestic Producers for judgment on the agency record as against the Canadian Wheat Board;
We VACATE the Court of International Trade’s judgment granting the motions of the Canadian Lumber Trade Alliance, Ontario Forest Industries Association, Ontario Lumber Manufacturers Association, The Free Trade Lumber Council, and Norsk Hydro Canada, Inc. (together, the “Lumber And Magnesium Plaintiffs”) for judgment on the agency record, and denying the motions of the United States and Domestic Producers for judgment on the agency record as against the Lumber And Magnesium Plaintiffs, and we REMAND with instructions to dismiss the complaints of the Lumber And Magnesium Plaintiffs;[26]
We AFFIRM the Court of International Trade’s judgment denying the motion of the Government of Canada for judgment on the agency record, granting the motions of the United States and Domestic Producers for judgment on the agency record as against the Government of Canada, and dismissing the Government of Canada’s complaint;
We AFFIRM the Court of International Trade’s declaratory judgment that, pursuant to Section 408 of the NIA, the CDSOA does not apply to antidumping and countervailing duties assessed on imports of goods from Canada or Mexico; and
We AFFIRM the Court of International Trade’s entry of a permanent injunction, but modify that injunction by striking the words “softwood lumber from Canada,” and “and magnesium from Canada.”

AFFIRMED-IN-PART; VACATED-IN-PART; and REMANDED

. Section 2 of the NIA provides that "[t]he term 'Agreement' means the North American Free Trade Agreement approved by the Congress under section 101(a).” 19 U.S.C. § 3301.

. CBP regulations provide that when deposits of duties are received by Customs, they are first placed into "clearing accounts,” and then the duties are moved into the CDSOA special accounts when the entries are liquidated. See 19 C.F.R. § 159.64(a)(2); id. § 159.64(b)(ii).

. An "affected domestic producer” is "any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons)” that: (A) supported imposition of the antidumping or countervailing duty order in question before Commerce; and *1327 (B) remains in operation. 19 U.S.C. § 1675c(b)(l) (2000).

. A “qualifying expenditure” is "an expenditure incurred after the issuance of the anti-dumping duty finding or order or countervailing duty order” in one of a number of categories including, inter alia, equipment, research and development, employee health benefits, and working capital. 19 U.S.C. § 1675c(b)(4) (2000).

. See Notice of Amended Final Determination of Sales at Less Than Fair Value and Anti-dumping Duty Order: Certain Softwood Lumber Products From Canada, 67 Fed.Reg. 36,-068 (May 22, 2002); Notice of Amended Final Affirmative Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain Softwood Lumber Products From Canada, 67 Fed.Reg. 36,070 (May 22, 2002); Final Affirmative Countervailing Duty Determinations: Pure Magnesium and Alloy Magnesium From Canada, 57 Fed.Reg. 30,946 (Jul. 13, 1992); Countervailing Duty Orders: Pure Magnesium and Alloy Magnesium From Canada, 57 Fed.Reg. 39,392 (Aug. 31, 1992); Anti-dumping Duty Order: Pure Magnesium From Canada, 57 Fed.Reg. 39,390 (Aug. 31, 1992); Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada, 68 Fed.Reg. 52,747 (Sept. 5, 2003); Notice of Final Determinations of Sales at Less Than Fair Value: Certain Durum Wheat and Hard Red Spring Wheat from Canada, 68 Fed.Reg. 52,741 (Sept. 5, 2003).

. See Customs CDSOA FY 2003 Final Annual Report, available at http://www.customs.gov/ xp/cgov/import/add_cvd/cont_dump/cdsoa_ 03/; Customs CDSOA FY 2004 Annual Report, available at http://www.customs.gov/xp/ *1328 cgov/import/add_cvd/cont_dump/cdsoa_04/; Customs CDSOA FY 2005 Annual Report, available al http://www.customs.gov/xp/cgov/ imporl/add_cvd/cont_dump/cdsoa_05/.

. Court of International Trade case nos. 1:05-cv-00324-DCP (filed by Canadian Lumber Trade Alliance); 1:05-cv-00325-DCP (filed by Norsk Hydro Canada, Inc.); 1:05-cv-00326DCP (filed by Canadian Wheat Board); 1:05-cv-00327-DCP (filed by Government of Canada); 1:05-cv-00328-DCP (filed by Ontario Forest Industries Association, et al.).

. See, e.g., complaint in case no. 1:05-cv00324-DCP, at 12.

. The United States did not oppose consolidation of the suits brought by the Canadian Producers, but did oppose consolidation of those suits with the suit brought by the Government of Canada.

. See Notice of Rescission of Countervailing Duty Reviews and Revocation of Countervailing Duty Order: Certain Softwood Lumber Products From Canada, 71 Fed.Reg. 61,714 (Oct. 19, 2006); Notice of Rescission of Anti-dumping Duty Reviews and Revocation of An-tidumping Duty Order: Certain Softwood Lumber Products From Canada, 71 Fed.Reg. 61,714 (Oct. 19, 2006).

. See sources cited at n. 10, supra.

. See Revocation of the Countervailing Duty Orders: Pure Magnesium and Alloy Magnesium from Canada, 71 Fed.Reg. 38,382 (Jul. 6, 2006) (effective Aug. 16, 2005). The anti-dumping order on pure magnesium had been revoked in 2004. See Pure Magnesium From Canada; Notice of NAFTA Binational Panel’s Final Decision, Amended Final Results of Full Sunset Review and Revocation of Antidumping Duty Order, 69 Fed.Reg. 70,649 (Dec. 7, 2004) (effective Aug. 1, 2000).

. Antidumping Duty Investigation and Countervailing Duty Investigation of Hard Red Spring Wheat from Canada: Notice of Panel Decision, Revocation of Countervailing and Antidumping Duty Orders and Termination of Suspension of Liquidation, 71 Fed.Reg. 8,275 (Feb. 16, 2006) (effective Jan. 2, 2006).

. See Customs CDSOA FY 2006 Certifications Received Report, available at http:// www.cbp.gov/lmkhandler/cgov/imporl/add_ cvd/cont_dump/cdsoa_06/ fy06_certs.ctt/fy06_certs.pdf.

. Oral argument at 6:50, available at http:// www.cafc.uscourts.gov/oralarguments/m p3/2006-1622.mp3.

. Given the sizes of the relevant markets and of the relatively modest CDSOA distributions challenged here, and given that money is fungible, it may well be that empirical analysis could not have provided any more certainty in this case, as the Court of International Trade recognized. See CLTA I, 425 F.Supp.2d at 1347 ("tracing where [CDSOA] distributions are used is a difficult, if not impossible, assignment”); id. at 1349 n. 26 (“the effect of subsidies may not be immediately clear; rather, the full effect of a subsidy may not be felt for years”).

. Of course, the United States and Domestic Producers were entitled to attempt to rebut such arguments from economic logic by showing that "core economic postulates” do not apply straightforwardly in the relevant markets, e.g., because the government has changed the rules of the game by tightly regulating the markets. Accord Adams, 10 F.3d at 925 ("We in no way suggest, of course, that the second amended complaint’s portrayal of milk industry economics is beyond refutation either on summary judgment or at trial.”).

. See, e.g., Adams, 10 F.3d at 922 ("it is 'obvious’ that appellants would sustain direct economic harm commensurate with the diminution of their current market share”).

. For example, Canada agreed to enact its own domestic implementation of NAFTA, presumably including preferential tariff treatment for imports from the United States.

. Therefore we need not address Canada's prudential standing under the APA and § 408 of the NIA.

. See Fed. Cir. Case no. 2006-1622, Docket Entry 112 (letter of counsel advising that "the Canadian Lumber Trade Alliance, Norsk Hydro Canada, Inc., and the Canadian Wheat Board do not intend to contest the mootness of this action as it pertains to the softwood lumber and magnesium industries”).

. The Canadian Wheat Board does not have standing to seek an injunction against distribution of duties assessed on softwood lumber or magnesium, however. Therefore we will modify the Court of International Trade’s injunction to apply only to duties assessed on hard red spring wheat from Canada. Cf. Forest Labs., Inc. v. Ivax Pharms., Inc., 501 F.3d 1263, 1265 (Fed.Cir.2007) ("We affirm the district court’s entry of judgment on validity and its entry of an injunction as to both Ivax and Cipla, but we modify the injunction to apply only to escitalopram oxalate.”).

. As the Supreme Court noted in Block, "congressional acquiescence” to "judicial construction [of a statute as] barring review” may be evidence that Congress intended the statute to bar review. 467 U.S. at 349, 104 S.Ct. 2450.

. Indeed, as the Court of International Trade observed, § 408 uses the phrase "apply to goods," not to distinguish goods from money, but to clarify a rule of origin, i.e., that the concern of this statute is the operation of AD and CVD laws respecting imports from NAFTA countries, as opposed to imports by NAFTA-party nationals from any country. CLTA I, 425 F.Supp.2d at 1367.

. "We presume that Congress is knowledgeable about existing law pertinent to legislation it enacts.” Bristol-Myers Squibb Co. v. Royce Lab., 69 F.3d 1130, 1136 (Fed.Cir.1995) (internal quotation omitted).

. See Arizonans for Official English, 520 U.S. at 71, 117 S.Ct. 1055 ("When a civil case becomes moot pending appellate adjudication, 'the established practice ... in the federal system ... is to reverse or vacate the judgment below and remand with a direction to dismiss.' " (quoting United States v. Munsing-wear, Inc., 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950))).